**The People of the State of Illinois, Plaintiff-Appellee, v. Jessie Sumner, Defendant-Appellant.**

Gen. No. 10,655.

Fourth District.

June 30, 1966.

F. Daniel Welsch, of Danville, for appellant.

John P. O'Rourke, State's Attorney of Vermilion County, of Danville, and John R. Dean, Special Assistant State's Attorney, for appellee.

SMITH, J.

Defendant was found guilty by a jury of the murder of Herschel Williams on an indictment in one count charging death by striking with an unknown blunt instrument and in another count with death by cutting the throat with a razor. Post-trial motions were denied and a sentence of 35–75 years was imposed. This appeal followed.

At first blush the circumstances in this record would seem to be fictional rather than factual. Williams' death is placed on March 31, 1963. Some fourteen months later, on June 1, 1964, his dismembered body was found in a 55-gallon oil barrel partially embedded in cement. The barrel was reclaimed on that day from the city dump of a neighboring city. There were no eyewitnesses to the tragedy. The defendant did not testify. The conviction is woven from circumstantial evidence and in the weaving, the defendant charges the trial court with reversible error. The defendant contends that the indictment is fatally defective; that the evidence does not establish guilt beyond a reasonable doubt; and that intervening errors require a new trial.

Since this appeal was taken, the Supreme Court has effectively nullified defendant's contention that the indictment failed to adequately state time and place. People v. Blanchett, 33 Ill2d 527, 212 NE2d 97. Without reciting the evidence in detail at this point, it is our opinion that the evidence adduced is sufficient to establish guilt beyond a reasonable doubt. We turn to the errors alleged which it is said requires a new trial.

The principle controversy centers around the refusal of the trial court to require the State to make available to the defendant for impeachment purposes statements of

State witnesses made to agents of the Federal Bureau of Investigation and the refusal of the trial court to require the State's Attorney to indicate whether he had copies of such reports in his file. In so stating the issues we do not imply that this was arbitrarily or capriciously done. The record is quite to the contrary— an observation, however, that does not preclude error, if error was actually committed. For reasons not disclosed by the record, the F. B. I. was conducting an investigation of this or some other matter and in so doing interviewed numerous witnesses including the defendant and a couple of his former cell mates in the penitentiary. The conversations to which we now refer were reduced to writing, were substantially verbatim reports of such conversations and were contained in the agents' reports which, at the time of the trial, were in the Springfield office of the F. B. I. The F. B. I. agents were called and testified for the State. With perhaps a single unimportant exception, the names of all witnesses were made available to the defendant and defendant's counsel interviewed the two cell mates in the penitentiary.

 It is apparent that the defense had copies of some statements. It is equally apparent that some were not made available to him. The availability for impeachment purposes of a statement made by a witness for the People or a statement made by a law enforcement officer containing a substantially verbatim account of a conversation between him and a witness for the State is no longer debatable. It has been the subject of much recent litigation and the guidelines are pretty well established. People v. Moses, 11 Ill2d 84, 142 NE2d 1; People v. Wolff, 19 Ill2d 318, 167 NE2d 197; People v. Cole, 30 Ill2d 375, 196 NE2d 691; People v. Wright, 30 Ill2d 519, 198 NE2d 316; People v. Edmunds, 30 Ill2d 538, 198 NE2d 313; People v. Jolliff, 31 Ill2d 462, 202 NE2d 506. These cases establish that where such documents are shown by the evidence to exist, are in the possession of or

261

subject to the control of the prosecutor, and there is no claim of irrelevancy, incompetence, privilege or detriment to the public interest, they must be made available to the defendant for impeachment purposes on demand. Wolff holds that if a claim is made that they contain unrelated matters, they shall first be inspected by the trial judge and the unrelated matters deleted before delivery to the defendant. Edmunds further establishes that a defendant may not be unduly restricted in cross-examination in his search for the existence of and the foundation proof required to trigger production of the documents for impeachment purposes. Failure to comply with these rules may, but does not always, result in a redoing of an otherwise properly done trial.

Undisputed evidence shows that the decedent, Williams, and the defendant were acquainted; that the decedent left his home on the afternoon of March 25, 1963, and was not seen alive again by his wife; that on March 28, defendant went to the city police and asked for protection against Williams who "had been bothering him"; that the body in the barrel was identified as that of Williams through tattoo marks, wallet, watch and fingerprints in the cement in which the hand was embedded; that identity of Williams was admitted by the defendant in closing argument; that defendant purchased two bags of cement or Sakrete on March 21 and it was ticketed to Don's Barber Shop, the trade name of his shop; that in March 1963, City Service Company sold him two purple and white 55 gallon antifreeze barrels similar to the one found in the city dump; that defendant told the F. B. I. he had purchased two such barrels, one still being at the shop and one had been stolen; that between April 11 and May 9, 1963, defendant hired one Maddox to haul some trash to the dump; one was a brown or black barrel and one was a purple barrel; the purple barrel weighed about 200 pounds, required both Maddox and the defendant to lift it and when asked what was in it, defendant

told Maddox "cement"; that the truck mired down in the yard and a couple came with a jeep to pull them out; that the trash was unloaded at a dump near Stamford and the purple barrel rolled down into a gully which was about 10 feet deep; for reasons not shown by the record, the city police, sheriff, and the F. B. I. bulldozed this area and unearthed the barrel with Williams' body inside; that it could not be determined because of decomposition whether the throat was cut; that X rays disclosed fractures which could have been fatal were the subject alive at the time they occurred; the examining doctor did not preclude other possible causes of death and did not categorically say the fractures did cause death. Photographs of the scene, the barrel and portions of the body were identified, admitted and viewed by the jury.

Witness Myers, a former cell mate, testified that Sumner told him in February of 1964 that he had killed Williams in his barber shop; that Williams had come to get the defendant to go on another job; that an argument ensued; that Williams threatened defendant's wife and children; that defendant didn't want any more to do with Williams; that he gave Williams a hair cut and shave, and cut his throat; that witness had talked to the F. B. I. and notes were made of the conversations on two occasions; that at the time of such conversations witness was in solitary confinement; that at the time of the conversations witness was disappointed with Sumner as witness was in solitary because some razors had disappeared and he thought Sumner had taken them; that witness examined the F. B. I. statement and agreed that he had not stated to them anything about trimming around the ears as he had testified on the witness stand; that he had told defendant's counsel that he didn't believe the defendant; that he was not threatened or promised any leniency or benefit, but that he was let out of solitary the same day.

Witness Curtis, a former cell mate, also testified substantially to the same things as Myers; that he had seen and read a statement of Myers' when he was interrogated; that he had said that he had not believed the defendant at first; that he now says that he did; that he is telling the truth now and didn't when he said he didn't believe the defendant and that notes were taken of his conversation. Motion by the defendant to produce was denied. Motion to require the State to indicate whether it has copies in the file was also denied.

Witness Maddox talked with the F. B. I. three times. In his first chat with the F. B. I. he denied that he knew the defendant, Jessie Sumner, explaining on the stand that he knew him only as Don. He further stated that he first thought the trash was hauled in December, 1962, or January, but that he was mistaken about that. That he was mistaken is evident from the fact that defendant did not acquire the barrels until March of 1963. One of his statements was made available to the defendant. Motion to produce the others was denied. Motion to require the State to disclose whether it had copies was denied.

F. B. I. agents Woods and Hazen testified to a conversation with the defendant on April 12, 1963; that defendant said that he last saw Williams on March 25, 1963; that Williams came to his shop and wanted the defendant to go on another job with him; that Williams had about $2,000 on him and wanted defendant to go with him, buy a boat and go to South America or Florida and that Williams left in his car and he hadn't seen him since. Hazen testified to a later conversation with defendant where they discussed the barrels, where defendant was asked who had cut out the top of the barrel and why he hadn't cut out both tops. Defendant answered that it was a lot of trouble. Hazen then accused the defendant of placing Williams in one of the barrels and defendant denied it. Motions to require production

264

of the statements or to require the State to disclose copies were denied.

█ It is apparent that the testimony of Maddox, Curtis and Myers is of vital significance. Notwithstanding able cross-examination disclosing inconsistencies and contradictions in their testimony on the stand and in prior statements to defense counsel and others, the jury chose to believe them. Neither the trial court nor this court knows whether further or additional impeachment would be provided by the production of the requested statements. It is not now known whether actual impeachment is nonexistent, a mere drop in the bucket or a deluge. Impeachment is not restricted alone to finding flat contradictions. Its broader scope is aptly stated by Mr. Justice Brennen in Jencks v. United States, 353 US 657, 1 L Ed2d 1103, 77 S Ct 1007, in these words:

"Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory. Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony."

Subpoenas duces tecum were not issued. Whether or not the F. B. I. agents could properly unveil their reports does not appear. Whether the State had copies available is unknown. In our opinion, the interests of justice require a resolution of these questions. People v. Cole, 30 Ill2d 375, 196 NE2d 691. This conclusion is the more impelling when we are considering a murder conviction bottomed upon circumstantial evidence coupled with ad-

265

missions of the defendant. The credibility of the witnesses assumes more than normal stature. Reversal, however, is not required. See People v. Wright, 30 Ill2d 519, 198 NE2d 316. It would be an idle gesture to reverse and remand for a new trial only to find on retrial that we seek the nonavailable or the nonexistent or that which is revealed is of little or no consequence, or comes within the scope of harmless error.

 Without benefit of these statements in the record, it is difficult for us to aid the trial court with any degree of specificity. The substantive and procedural aspects of the problem have been extensively discussed in United States v. Hilbrich, 232 F Supp 111 and Campbell v. United States, 365 US 85, 5 L Ed2d 428, 81 S Ct 421, annotation: 5 L Ed2d 1014. It clearly appears from this record that statements were made to F. B. I. agents or to others called by the State as witnesses. Appropriate motions were made by the defense to produce such statements for possible impeachment. As clearly stated in Campbell I and abundantly intimated by our Supreme Court in the cases already cited herein, the responsibility for determining the existence, the availability, the producibility and the relevancy of these statements rests squarely with the trial judge in a nonadversary proceeding. See Campbell I. The function of both prosecution and defense as adversaries fades into insignificance and it becomes their function and their duty to come forward with relevant evidence which will assist the trial judge in properly carrying the burden cast upon him. Accordingly, this cause is remanded to the trial court with directions to initiate and conduct in open court, after notice to all parties, an exploration into the existence, availability, proper producibility and relevancy of these statements. In so doing, he may properly resort to such process and such sanctions as may be reasonably necessary or required to accomplish this purpose. His problem is first to determine what we have and then determine

its proper producibility and, if properly producible, its effect on the result of the trial, if any. If it appears that evidence is revealed which might reasonably have affected the verdict or warrants the conclusion that a fair trial was not had, then the trial court shall vacate the judgment and grant a new trial. If the determination of the trial court is otherwise, the court shall make findings of fact to that effect, shall impound such statements and make them a part of the record, shall vacate the judgment and enter a new judgment of conviction and impose a new sentence with appropriate consideration to the time already served under the old sentence.

We have carefully considered the other alleged errors in this record and have concluded they relate to matters not uncommon in a trial of this nature, and did not affect the verdict and do not warrant a new trial.

Remanded with directions.

TRAPP, P. J. and CRAVEN, J., concur.