The People of the State of Illinois, Plaintiff-Appellee,
v. Jessie Sumner, Defendant-Appellant.

Gen. No. 10,857.

Fourth District.

February 28, 1968.

F. Daniel Welsch, of Danville, for appellant.

John P. O'Rourke, State's Attorney of Vermilion County, of Danville (Ralph D. Mawdsley, Assistant State's Attorney, of counsel), for appellee.

CRAVEN, J., delivered the opinion of the court.

In a prior appeal to this court from a judgment of conviction of the crime of murder, we remanded this case to the trial court, with directions to conduct hearings to determine the existence, availability, producibility, and relevancy of certain pretrial statements of witnesses who testified at the trial. People v. Sumner, 72 Ill App2d 258, 218 NE2d 236 (4th Dist 1966).

The purpose of that remandment was to determine whether or not impeachment evidence existed which should have been given to the defendant for his attorney's use at the trial. The inquiry was framed upon the issues of whether such evidence, if it existed, was producible and whether the failure to produce it at the trial for the use of the defendant had a prejudicial effect on the result of that trial.

That hearing has been conducted and the trial court has rendered its opinion and judgment which determined that certain statements existed and should have been produced for use by the defendant but that the effect of the failure to do so was not prejudicial.

A total of fourteen pretrial statements or memoranda were in the F. B. I. files as a result of its investigation of the defendant's activities. Eleven of these had been given by the F. B. I. to the state's attorney of Vermilion County prior to trial. Three of these eleven had been given to defendant. The trial court held that the eight remaining statements or memoranda were the only ones which were producible at the demand of defendant at the trial since the remaining three documents the F. B. I. had retained were not in possession of the state's attorney at any time here relevant. People v. Wright, 30 Ill2d 519, 198 NE2d 316, 321 (1964).

The present appeal brings before us only the issues determined in the subsequent proceeding. The record in this case as made following remandment clearly demonstrates that the trial court, the state's attorney, the attorney for the defendant, and the F. B. I. cooperated to conduct a hearing which procedurally complied with the mandate of our former opinion.

Defendant's primary contention here, however, is that the decision of the trial court that the error committed in failing to give the defendant's attorney access to the statements and summaries of statements in the hands of the prosecution was not prejudicial, is itself

error. Two reasons are assigned in support of this contention. First, defendant contends that since the withheld accounts of conversations with the witnesses Maddox and Curtis contain matters which are contradictory to their testimony at the trial, the "harmless error" doctrine does not apply and reversal is required. Second, since the statements attributed to the witness Maddox contain evidentiary material favorable to the defendant which was not disclosed by the prosecution, concealment or suppression of evidence requiring a new trial occurred. The new matter in this statement would tend to negate a connection between the barrels delivered by Maddox and the defendant to the dump at Stanford, Illinois, and the death of Herschel Williams. Resolution of these contentions requires an analysis of the content of the statements and the relationship of the material in them to the evidence at the trial.

There is a discussion of the evidence and the original rulings of the trial court which resulted in the hearing from which this appeal arises in our earlier opinion. The testimony given by Maddox was one of the keys to the prosecution's case. His trial testimony was to the effect that in April or May of 1963, on a Sunday, the defendant called Maddox to load and haul two barrels, one of which was painted and the other black, in his father's ¾-ton pickup truck, from Danville to a little town called Stanford near Bloomington, Illinois, which he did. The "old barrel" was light but the painted barrel required two people to lift it. Other evidence very clearly indicated that the decedent was never seen alive subsequent to March 25, 1963. His dismembered body was later discovered in a barrel in a dump near Stanford, Illinois. During the original F. B. I. investigation, Maddox had been interviewed three times, on May 15, 19, and 27, 1964. The results of these interviews had been transcribed by the agent conducting them, substantially verbatim, into one document. This document, although pro-

ducible at the trial upon defendant's demand, was one of the documents which the court did not order the state's attorney to produce.

The prosecution had given the defendant, prior to trial, a signed statement of Maddox taken on July 10, 1964, by West, a deputy sheriff. This statement was used by the defendant's counsel in cross-examining this witness at the trial. The trial court, in its findings and order, noted the discrepancies which exist between the testimony of Maddox at the trial, the statements in May to the F. B. I., and the statement in July to Deputy Sheriff West. We set them forth verbatim as they appear both in the trial court's order and the memorandum submitted by the defendant:

"TESTIMONY AT THE TRIAL

A. IDENTIFICATION OF THE BARREL

Witness: Maddox

Rec. 116

'One was old and rusty and had a few holes in it., the other was fairly new'—'The old one was rusty brown,' the other was 'purple and white.'

117

'The rusty one I could lift myself, the other Sumner had to help me—it was heavy.'

119

'The flap on the barrel was cut, twigs and branches sticking through the top.'

STATEMENTS

Statement 5/19/66 [*sic*, 5/19/64]:

'*Both drums had tops on them and one had four holes in it.*' Did not recall any identifying characteristics about the drums. Then later statement: 'One barrel was green and white and had *no top*' and it was full of paper and rags. Second barrel was black and had a top with holes about 2½" to 3" in diameter. The *green and white one was light* but took both men to load the *black* one.

Statement to West 7/10/64:

One was black and the other purple and white.

390

| TESTIMONY AT THE TRIAL—Cont. | STATEMENTS—Cont. |
|---|---|

**TESTIMONY AT THE TRIAL—Cont.**

128

*'Identified the barrel by the color and the way the flap was on it—purple and white.'*

129

Top was cut and bent up.

133

This also was a means of identification.

NOTE:

Exhibit 1—the barrel—offered in evidence was purple and white, the lid cut completely off with no flap of any kind and when found appeared flush with concrete.

### B. OTHER INCONSISTENCIES

Rec. 113–115
Abst. 5

Maddox testified in the latter part of April—on a Sunday —the defendant called Maddox and wanted him to do some hauling for him. Said he had to go and pick up barber equipment.

**STATEMENTS—Cont.**

1. Statement to F.B.I.

Maddox stated: 'He did not recall taking any type of trash or oil drums from Danville to Stanford for anyone at any time.'

Statement to F.B.I. 5/19/64:

Maddox stated in the latter part of December, 1962, or the early part of January, 1963, he hauled the drums to the Bloomington area.

Statement to F.B.I. 5/27/64:

Maddox stated that one day in December, 1962, Don (the defendant) called and asked him to haul some barber equipment to Danville; that Maddox drove to Don's shop and Don told him he had some things to take to the dump en route (and went on to

391

## TESTIMONY AT THE TRIAL—Cont.

## STATEMENTS—Cont.

state that he and the defendant took two barrels to Stanford, Illinois).

Statement to Wm. West 7/10/64:

Maddox told West that somewhere around the latter part of December, 1962, or the first part of January, 1963, they did the hauling of the barrels to Stanford, Illinois.

Statement to West 7/10/64:

Maddox stated: 'Sumner told him they were going to dump it right outside of Stanford, Illinois.'

2. Identification of the defendant:

Rec. 130 & 131
Abst. 9

Statement to F.B.I. 5/15/64:

Maddox testified that he had not known the defendant too long—about five or six months; that he got his hair cut at the defendant's shop.

Maddox stated he did not recall knowing a Jessie *Donald* Sumner.

Statement to Wm. West 7/10/64:

Rec. 133–135
Abst. 9

Maddox stated he did not know Jessie Sumner by that name. He knew him as Don. He did not know his last name either.

When asked why he denied knowing Donald Sumner he stated he did not know the name Jessie Sumner. That in the meantime he had talked to his mother by phone and she had told him that if he knew anything it was his duty to tell the officers.

Statement to F.B.I. 5/19/64:

He stated that he had known the defendant for approximate-

TESTIMONY AT THE TRIAL—Cont.

STATEMENTS—Cont.

ly one year and had gone with his niece, Judy Shatto.

## C. LOCATION OF THE DUMP

Rec. 122

Abst. 78 [*sic*, 7]

'We was going down the highway just about the city limits of Stanford we turned off to the right, a paved road, went down a little ways and the road turned off again to the right for a dirt road, and *right there* was a dump, and we pulled in and backed the truck up and dumped the barrels.'

Abst. 11

McElvaney described the location of the dump as being on a black topped road at what they called Sportsman's Lake near Stanford.

Rec. 150 [*sic*, 149]

Abst. 11

McElvaney testified: 'It's on a black topped road, oh, I'd say a mile or a mile and a half east of Stanford.'

Statement 5/27/64:

'About 300 yards from the city limits sign for Stanford they turned off a paved road to the right. As they proceeded up this road two miles they turned off on a dirt road to the right and continued another two miles.' Maddox said that he observed a gully being used as a dump and saw trash, including old appliances in the gully then he went 200 feet along the edge of the gully to the end where they dumped the trash, including the barrels into the gully.

## D. STATEMENT OF CURTIS WITH REFERENCE TO CONVERSATION WITH THE DEFENDANT

Rec. 295

Abst. 26

Curtis testified that he met the defendant in January,

Statement to F.B.I. 6/29/64:

He stated that he was briefly acquainted with Jessie Donald Sumner in the prison barber

393

| TESTIMONY AT THE TRIAL—Cont. | STATEMENTS—Cont. |
|---|---|
| 1964; saw him once a week; talked to him frequently; was pretty well acquainted with him. | shop during the first part of June, 1964 (which incidently [sic] is subsequent to the date of the discovery of the body of Herschel Williams)." |

In addition to the discrepancies noted above, in May, 1964, at the second interview, Maddox recognized the defendant and identified him as "Don the Barber." He also recognized the decedent, Herschel Williams, by photograph, but he stated that Williams was the person who helped him load barber equipment into his truck *following* the dumping of the barrels at a little town just outside Bloomington.

At the third interview, on May 27, 1964, Maddox confirmed the May 19 version and reaffirmed that he saw Herschel Williams alive in Stanford *after* the barrels were dumped. In this statement, he also says that "he was sure he saw Williams on the Street in Danville at least twice in the next two months after this incident . . . ."

The statement of Curtis, which was not produced, was taken on June 29, 1964, and indicated that he had met the defendant, Sumner, in the prison barbershop during the first part of June, 1964. This is different from his testimony at the trial that he met the defendant in January, 1964, and saw him on more than one occasion— about once a week; that he was pretty well acquainted with him. The first meeting, if it took place at the time given in the statement, occurred after the discovery of the body of Herschel Williams was publicized.

■ The material in the nonproduced statements of these two witnesses is not so strongly exculpatory nor so in conflict with the testimony at the trial that its nonproduction was a violation of due process. Brady v. State of Maryland, 373 US 83, 10 L Ed2d 215, 83 S Ct 1194

(1963), relied upon by the defendant, involved failure of the prosecution to advise the defendant that an accomplice had confessed to the actual strangulation of the victim for which the defendant was being tried as a principal. The discrepancies in the nonproduced statements here are not of this magnitude. The cases relied upon by defendant on this point are distinguishable by the fact that the statement withheld was directly, not inferentially, exculpatory. Evidence is not suppressed when the prosecutor fails to bring out every inconsistency in pretrial statements of witnesses compared with their testimony, nor when he fails to advise the defendant that matters were inquired into prior to trial that were not brought out by the testimony of the witness. To so hold would interfere to an unwarranted degree in the trial tactics and trial preparation of the state's attorney. The abuse sought to be corrected is amply controlled by surrender, at the trial, of the pretrial statements of the witness testifying, in the mode set forth in People v. Wolff, 19 Ill2d 318, 167 NE2d 197 (1960), for use by defendant in cross-examination. For these reasons, we reject the contention that this case must be reversed for the concealment or suppression of evidence.

■■ The rule requiring production of these statements and memoranda as announced in People v. Wolff, 19 Ill2d 318, 167 NE2d 197 (1960), while based upon considerations of fundamental fairness, as developed in the federal-court system by both judicial decision and statute (Palermo v. United States, 360 US 343, 3 L Ed2d 1287, 79 S Ct 1217 (1959)), never has been based upon any specific substantive constitutional guarantee. It is a rule of procedure designed to further the fair and just administration of criminal justice. Campbell v. United States, 373 US 487, 10 L Ed2d 501, 83 S Ct 1356 (1963). There will be many occasions, as here, where the dis-

crepancies disclosed during that investigation are a proper matter for cross-examination and yet are not directly exculpatory of the defendant to the point that bad faith on the part of the prosecution must be legally presumed through failure to disclose the existence of the contradictory statement. In other cases, the failure to produce the statements, while improper, cannot conceivably have affected the result of the trial either because the statement bears upon the testimony of only one of many witnesses whose testimony is merely cumulative, People v. Wolff, 19 Ill2d 318, 167 NE2d 197 (1960), or the evidence withheld from inspection did not concern an issue which was contested at the trial, People v. Tribbett, 90 Ill App2d 296, 232 NE2d 523 (4th Dist 1967).

██ The test, then, of the extent of the error committed here by failure to give these statements, in the hands of the prosecution, to the defendant upon demand is empirical and must be made on an ad hoc basis. Necessarily, therefore, the standards by which the extent of error must be judged are those standards applicable to the doctrine of harmless error. That test and standard is that the error could not be said to have reasonably affected the verdict or that there was other evidence which established the defendant's guilt beyond a reasonable doubt.

██ However, when the credibility of a defendant is impeached by showing a prior conviction established to have been invalid, this error requires a reversal notwithstanding the quantum of remaining competent evidence to sustain the conviction. People v. Shook, 35 Ill2d 597, 221 NE2d 290 (1966). Likewise, error in the admission of a confession of the defendant cannot be harmless error, and "a mere mechanical subtraction of the confession(s) from the competent evidence" is not an appropriate measure of the harm occasioned by the error. People v. Mason, 38 Ill2d 411, 231 NE2d 393 (1967). In People v. Rhodes, 38 Ill2d 389, 231 NE2d 400 (1967), the

court held that improperly admitted wire-tapping evidence did not preclude a conviction when there was other and independent evidence to establish guilt. In this case, as we stated in our earlier opinion, it was error to deny the statements now in the record to the defendant on his demand. The detailed analysis of these statements contained in the opinion of the trial court indicates, however, that to the extent that the information therein contained could have been used for impeachment, it was either merely cumulative or related to details ancillary to the substance of the testimony received at the trial.

It is clear that had the statements been available, there would have been available to the defendant a basis for impeachment. We are satisfied, however, that the variations between testimony and statement as to dates, color and description of the barrels, and other details were not so grave as to reasonably affect the verdict of the jury. The finding that the error was not prejudicial is affirmed. See Rosenberg v. United States, 360 US 367, 3 L Ed2d 1304, 79 S Ct 1231 (1959).

Judgment affirmed.

SMITH, P. J. and TRAPP, J., concur.