(No. 41363.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* JESSIE SUMNER, Appellant.

*Opinion filed Sept. 26, 1969.—Rehearing denied Nov. 25, 1969.*

F. DANIEL WELSCH, of Danville, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and JOHN MORTON JONES, State's Attorney, of Danville, (FRED G. LEACH, Assistant Attorney General, and LARRY P. CRAMER, Special Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE WARD delivered the opinion of the court:

A jury in the circuit court of Vermilion County found the defendant, Jessie Sumner, guilty of the murder of Herschel Williams and he was sentenced to a term of 35 to 75 years. On appeal, the Appellate Court for the Fourth District held that the defendant's guilt had been established beyond a reasonable doubt and that certain errors claimed did not require a new trial. However, the cause was remanded to the trial court with directions to conduct a hearing into the "existence, availability, proper producibility and relevancy" of pretrial statements of certain State witnesses which, it appeared from the record, had been made to agents of the Federal Bureau of Investigation and others, and which, though properly requested at trial by the defendant, had not been produced. The trial court was also ordered to determine whether the failure to produce the statements, if existent and producible, might reasonably have affected the verdict or otherwise deprived the defendant of a fair trial. 72 Ill. App. 2d 258.

The trial court on remand ascertained that certain pertinent statements had been in the possession of the prosecution during trial but it found there was no prejudicial error from the failure to produce them for the defendant's possible use in impeachment. On appeal from this judgment, which was consolidated with the original appeal, the appellate court held that the trial court had erred in denying the statements "now in the record" to the defendant on demand at the time of trial. However, it rejected the argument that there had been a suppression or concealment of evidence by the prosecution. The court also decided that had the information in the documents been available to the defense for impeachment purposes the verdict could not reasonably have been affected. As a consequence, the denial was not prejudicial the court said, and the judgment of the trial court was affirmed. (92 Ill. App. 2d 386.) We have granted the defendant leave to appeal from these decisions of the

appellate court. See Rules 318(b) and 612(b) of this court.

The defendant's first complaint is that the judgments of the trial court and appellate court should be reversed because the evidence failed to establish his guilt beyond a reasonable doubt.

The body of the victim was found in a barrel on June 1, 1964. The first opinion of the appellate court provides a fair summary of the undisputed circumstantial evidence presented by the State at trial. That summary was "that the decedent, Williams, and the defendant were acquainted; that the decedent left his home on the afternoon of March 25, 1963, and was not seen alive again by his wife; that on March 28, defendant went to the city police and asked for protection against Williams who 'had been bothering him'; that the body in the barrel was identified as that of Williams through tattoo marks, wallet, watch and fingerprints in the cement in which the hand was embedded; that identity of Williams was admitted by the defendant in closing argument; that defendant purchased two bags of cement or Sakrete on March 21 and it was ticketed to Don's Barber Shop, the trade name of his shop; that in March 1963, City Service Company sold him two purple and white 55 gallon anti-freeze barrels similar to the one found in the city dump; that defendant told the F.B.I. he had purchased two such barrels, one still being at the shop and one had been stolen; that between April 11 and May 9, 1963, defendant hired one Maddox to haul some trash to the dump; one was a brown or black barrel and one was a purple barrel; the purple barrel weighed about 200 pounds, required both Maddox and the defendant to lift it and when asked what was in it, defendant told Maddox 'cement'; that the truck mired down in the yard and a couple came with a jeep to pull them out; that the trash was unloaded at a dump near Stanford and the purple barrel rolled down into a gulley which was about 10 feet deep; for reasons not shown by the record, the city police, sheriff, and the F.B.I. bulldozed this

area [on June 1, 1964] and unearthed the barrel with Williams' body inside; that it could not be determined because of decomposition whether the throat was cut; that X rays disclosed fractures which could have been fatal were the subject alive at the time they occurred; the examining doctor did not preclude other possible causes of death and did not categorically say the fractures did cause death. Photographs of the scene, the barrel and portions of the body were identified, admitted and viewed by the jury." 72 Ill. App. 2d at 262-263.

Other evidence presented included the testimony of Larry Faye Myers who testified that the defendant had told him, when they were cellmates in prison, that he had killed Herschel Williams in his, *i.e.*, the defendant's barbershop. According to that testimony, the defendant had stated that Williams had come to enlist the defendant "in pulling another job", but the defendant had told Williams that he didn't want anything more to do with him, and an argument had ensued. The testimony continued that Williams then had requested a haircut and shave and that the defendant after giving a haircut and shave proceeded to cut his throat, causing William's death. John Curtis, another fellow prisoner of the defendant, also testified that the defendant had told him that he had killed his criminal associate in the barbershop by cutting his throat. Cross-examination of these witnesses developed that each had been convicted of an infamous crime. It brought out that each had given the Federal Bureau of Investigation a statement concerning the defendant's admissions after having been in solitary confinement for 15 days, and that each thought that his solitary confinement was caused in some way by the defendant. Myers and Curtis testified that they had not been threatened or promised any leniency for these prior statements, but under cross-examination Curtis testified he had been asked to "co-operate" and Myers testified he was told that if he did not co-operate he would serve maximum time so far as his

sentence was concerned. It was further brought out on cross-examination that both witnesses were released from solitary confinement immediately after giving their statements and that Curtis was admitted to parole 3 or 4 months later at the expiration of his minimum sentence. Both witnesses acknowledged that they were acquainted with the publicized facts of the case at the time of their statements.

The sole witness presented by the defense at trial was a pathologist, who had not examined the body of the victim. His testimony was offered to counter the State's medical evidence that the multiple skull fractures found probably were sustained when the victim was still alive.

It is peculiarly the province of the jury to weigh the evidence, judge the credibility of witnesses and determine the facts. A reviewing court will not set aside a jury's verdict of guilty unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to cause a reasonable doubt as to the guilt of the accused. (*People* v. *Prohaska,* 8 Ill.2d 579, 589-90; *People* v. *Sustak,* 15 Ill.2d 115, 123; *People* v. *Ford,* 19 Ill.2d 466, 480.) Here the circumstantial evidence and the testimony of Myers and Curtis were sufficient to support a guilty verdict.

The defendant argued on his first appeal in the appellate court that his cross-examination and opportunity for possible impeachment of State witnesses were improperly limited by the trial court's failure to require the prosecution to furnish the pretrial statements which he requested. He now urges, the statements having been disclosed to him, that the withholding of them by the State constituted a suppression or concealment of evidence material to his defense which violated his right to due process of law.

Prior to trial, the State delivered three statements to the defendant. At trial, when it became apparent from the cross-examination of certain witnesses, including Maddox and Curtis, who are hereafter discussed, that other pretrial statements had been made, the defendant moved for their

production. The trial court made no inquiry whether the prosecution was in possession of the statements, and denied the motion. After remand of the cause by the appellate court, it was disclosed that the State at the time of the trial had eight investigative reports, including six interview reports which had not been made available to the defendant. These reports were made part of the record which is before us.

The controversy has centered about two of the reports. The first is a report which incorporated three interviews had with John Maddox, who said he had hauled the barrels for the defendant to the dump area near Stanford. The Maddox interviews were had on May 15, 19 and 27, 1964. The body of Herschel Williams was discovered on June 1, 1964. The People's theory of the case, supported by Maddox's testimony, was that Williams's body had been put in one of the barrels transported and dumped by Maddox and the defendant. The report discloses that Maddox had stated at the last two interviews that Williams, whom Maddox had identified from a photograph, was the man whom he and the defendant had visited in Stanford after dumping the barrels and that the man he named as Williams had helped them load some barber equipment for their return trip to Danville. Further, Maddox stated on the May 27th interview that he had seen Williams on the street in Danville at least twice in the two months following the hauling incident.

The second report in issue contains statements by John Curtis to an investigating agent as to the incriminating statement the defendant had made to him in prison. Curtis testified that the defendant had told him he had killed his criminal associate by cutting his throat. Also Curtis's testimony was that he had met the defendant in January, 1964, and that the admissions were made shortly thereafter. But his prior statement was that he had met the defendant in the prison barbershop in June, 1964, on a date after the discovery of the body and after accounts of the discovery

had been published. The defendant argues that this earlier version by Curtis as to the time of the defendant's statement to him contradicted the witness's testimony and, had he known of the statement, it would have been of obvious value to him at trial.

It is the State's position that the withholding by the prosecution of the materials did not amount to a suppression or concealment of evidence and that the failure to tender them to the defense for possible use in impeachment, though concededly error, was, under the circumstances, harmless error.

Maddox's statements of interview should have been made available to the defendant. In these statements Maddox declared he had seen Williams, the murdered man, three times subsequent to his assisting the defendant in removing the barrels to the dump. These declarations by the witness obviously contradicted the prosecution's theory that the defendant had hired Maddox to assist him in disposing of the victim's body and that Maddox unknowingly had done so. The defendant, using a statement given by Maddox to a deputy sheriff, had cross-examined him closely as to the description of the barrels he and the defendant had hauled and as to the place where the barrels were dumped. Some discrepancies between the statement and the testimony of Maddox were exposed by the cross-examination. The defendant's design in this obviously was to combat the theory that the victim's body was in one of the barrels Maddox handled and was to invite the conclusion that the body of Williams had been recovered from what had been a different dumping of barrels. The State's cause would have been damaged by a revelation that an important witness for it believed he had seen the victim three times, when, according to the prosecution's reconstruction of events, the victim was already dead. The Supreme Court in *Brady* v. *Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 218, said: "We now hold that the suppression by the prosecution of evi-

dence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (See American Bar Association Standards Relating to Discovery and Procedure Before Trial, § 2.1(c), p. 53; cf. *People* v. *Cagle,* 41 Ill.2d 528, 534, 535.) The refusal to make the statements of interview available to the defendant was, however properly motivated, the equivalent of a suppression of evidence which deprived the defendant of due process. We cannot regard the failure here as harmless error, as we cannot declare beyond reasonable doubt that the suppression did not contribute to the finding of guilty. *Chapman* v. *California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People* v. *Smith,* 38 Ill.2d 13.

Curtis's statement should also have been given to the defendant. This court in *People* v. *Wolff,* 19 Ill.2d 318, expressly adopted the Federal rule first announced in *Jencks* v. *United States,* 353 U.S. 657, 1 L. Ed. 2d 1103, 77 S. Ct. 1007, and later made part of a Federal statute, (18 U.S.C. sec. 3500) that where the relevancy and competency of a statement or report has been established, and no privilege exists, the trial court, on appropriate demand, shall order the statement or report delivered directly to the accused for his inspection and possible use for impeachment purposes. (19 Ill.2d at 327; see also *People* v. *Cagle,* 41 Ill.2d 528, 532.) It was expressly recognized in *Wolff* that once a statement is shown to contain pertinent material, only the defense should be permitted to determine whether it may be useful for impeachment. 19 Ill.2d at 325; *Rosenberg* v. *United States,* 360 U.S. 367, 371, 3 L. Ed. 2d 1304, 79 S. Ct. 1231, 1234; see also *Scales* v. *United States,* 367 U.S. 203, 258, 6 L. Ed. 2d 782, 81 S. Ct. 1469; *Lewis* v. *United States* (8th cir.), 340 F.2d 678, 682, and cases there cited.

The statement of Curtis was certainly relevant and competent and could have been used in the impeachment of the witness. It was evidence of a prior inconsistent state-

ment with respect to Curtis's testimony fixing the time of his meeting the defendant and the time of the defendant's incriminating statements to Curtis.

We need not consider the effect of the withholding of the Curtis statement, in view of our conclusion that the trial court's refusal to make the Maddox report available to the defendant deprived him of due process.

We have reviewed the other contentions argued by the defendant in the appellate court and presented again here, but as we perceive no other error was committed, it is not necessary to discuss them.

The judgments of the circuit court of Vermilion County and the Appellate Court, Fourth District, are reversed and the cause is remanded to the circuit court for a new trial.

*Reversed and remanded.*