THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY CAUTHEN, Defendant-Appellant.

First District (5th Division)   No. 76-1303

Opinion filed August 5, 1977.

Leroy J. Tornquist, of King, Robin, Gale & Pillinger, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Timothy Quinn, and Mary C. Shropshire, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of the business offense of commercial bribery in violation of section 29A-1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 29A-1) and was fined $2,000. He contends the trial court erred when (1) it failed to require the State to produce two electronic tape recordings; (2) denied his motion for a bill of particulars; (3) allowed the State to amend the complaint at the close of its case; and (4) adjudged him guilty beyond a reasonable doubt.

Defendant was charged in a criminal misdemeanor complaint filed by Michael Wells with committing the offense of offering a bribe in that he:

"conferred a benefit (United States currency) upon Michael Wells (an employee of Allstate Insurance Company—Property Adjustor) without the consent of Allstate Insurance Company (an Illinois corporation) with the intent to influence his conduct in relation to his employer's business affairs, to wit: inflate the amount of fire loss for a building located at 8715 S. Houston, Chicago, Illinois, which is insured by Allstate Insurance Co., in violation of Chapter 38, Section 29A-1."

Defendant filed a pretrial motion to compel disclosure of all exculpatory materials, any confession by defendant, all electronic surveillance information, and to require the State to answer a bill of

particulars giving the time, date, location, manner and method of the offense. Following a hearing on the motion, the trial court ordered the State to produce all exculpatory materials, confessions and a list of witnesses, but denied defendant's motion for a bill of particulars and for discovery of any electronic surveillance.

Defendant then filed a second pretrial motion to compel disclosure of the electronic surveillance material. The record on appeal does not contain a ruling by the trial court on this motion. Thereafter, defendant filed a motion to suppress the use of the tapes at trial on the grounds that the seizure and nondisclosure of the tapes deprived him of his rights under the Federal and State constitutions. The trial court denied this motion.

After the jury was selected, the assistant State's attorney read the complaint and explained that the evidence would show defendant offered a bribe intending to influence Wells to inflate the amount of the fire loss for the building. In his opening statement defense counsel stated that defendant gratuitously offered Wells $300 *after* he had secured the repair job from Allstate, and, therefore, defendant did not intend to influence Wells to inflate the job's cost estimate.

The following pertinent evidence was adduced at trial.

*Michael Wells for the State*

He is a claim adjuster for Allstate Insurance Company. He was assigned to adjust a fire loss at 8715 South Houston in Chicago. Defendant, a contractor was originally contacted by Ron Heflin, an Allstate adjuster, to bid on the repair job for the building. Wells first met defendant on February 3, 1975, at the damaged building and they prepared specifications and estimates of the work to be done.

On February 13, 1975, he went to defendant's office at 3815 West Division Street. Defendant brought his revised written estimate into a room and placed it on the corner of a desk. Defendant said "I want you to know that this is in it for you," wrote 500 on a piece of paper, and drew an arrow pointing to the estimate. When Wells replied that he did not do business that way, defendant discarded the paper. At this time Allstate was not bound to do business with defendant.

Prior to his next meeting with defendant on February 26, 1975, he met with his supervisors and an assistant state's attorney. He consented to having a tape recorder attached to his body. At the February 26 meeting, defendant asked Wells if he was interested in what they had talked about before. When Wells said he was not sure what that was, defendant wrote $800 on a pad of paper, and asked "is eight pieces okay?" Wells asked what he would have to do for the money and defendant said "zero." Defendant specifically told him that he would not be required to "jack up the estimate." Defendant later stated that he wanted Wells to make sure

the Peculises placed the repair job with defendant and that he wanted the repair price to include the depreciation previously deducted. Defendant agreed to advance part of the money to Wells and they left defendant's office to cash a check. Defendant again stated that Wells should sell the Peculises on having defendant perform the repairs. Throughout their conversations that day, defendant advised Wells not to let the money upset him because this was a common practice and defendant often engaged in it. When the bank would not honor the check, they returned to defendant's office and parted.

On February 28, 1975, he met defendant at the Peculis' residence. Wells was again equipped with a tape recorder. After explaining the loss estimate and depreciation deduction and telling them that defendant was willing to do the repairs needed, he met with defendant on the second floor. He asked defendant what would happen if Allstate did not pay his estimated price. Defendant replied that Wells would still receive something. He also asked what would happen if he could not give defendant the job. Defendant replied that they would not have any sort of arrangement in that event. Defendant then gave him $300 and said the balance would be forthcoming when the job was completed. Defendant added that he could net Wells "ten big ones a year" in return for 10 large repair jobs and would also pay for additional estimating job referrals.

Wells financial condition throughout this period was stable. When he and defendant had lunch together on February 13, 1975, he paid his own check. He identified Allstate's standard defalcation letter given to adjusters and it was admitted in evidence.

On cross-examination he stated that he had reviewed the transcripts of the tape recordings in preparation for his court appearance. Defendant thereupon renewed his motion for production and argued the need for the tapes for impeachment purposes. The trial court denied this motion. However, when trial resumed the next morning, the court ordered the State to produce these materials.

He admitted that defendant's estimate of the loss was fair and was $3500 less than a competitive bid. The owner of the building, not Allstate, controls who does the repair work. He denied telling defendant that he was having financial problems or that he could not afford to pay for defendant's lunch on February 13. Defendant never asked him to do anything in return for the money defendant offered on that day.

He admitted telling defendant that he had been thinking about their prior conversation on February 26. Defendant told him three times he would not have to do anything in return for the money. Defendant stated that if he was not the low bidder then he blew the job. He again admitted that defendant told him he did not expect him to inflate the estimate, but only to sell the people on the depreciation and on placing the repair

contract with him. The State stipulated that Wells directly or inferentially asked for the money six times on February 26, 1975. He turned off the recorder during the ride back from the bank to defendant's office that day.

On the fourth day of trial following a weekend recess, the State moved to amend the complaint by deleting the words "inflate the amount of a fire loss for a" after the words "to wit" and to insert in its place the words "influence the owners of a fire damaged." The trial court reserved its ruling on this motion.

During this period, over defendant's objection, the tape recordings were admitted into evidence and played for the jury.

Subsequently the trial court allowed the amendment to the complaint, offered to recall Michael Wells as the court's witness for further cross-examination by defendant, and to allow defendant additional time to prepare its defense. When defendant's request for one week's time was denied, the State rested its case. Defendant proceeded with its case.

*Defendant Jerry Cauthen on his own behalf*

He was a general contractor and a public adjuster. After lunch on February 13, 1975, Wells remarked that it was difficult to pay for his own bill and that he was operating on a tight budget because his wife was expecting a baby. On February 10, 1975, Wells told him that he was the low bidder and that he had the job subject only to the approval of Wells' supervisors.

On February 13, 1975, he spontaneously offered Wells $300 because he liked him. When Wells panicked, he explained this was an unqualified, unconditional gift. He apologized and Wells assured him it would be forgotten.

Wells was trembling, nervous, and crying when he arrived at defendant's office on February 26, 1975. Wells said he had changed his mind and began writing eights on a piece of paper. Defendant did not bring up the subject of money on this date. He again told Wells he did not want anything from him. He did not intend to pay Wells when they went to the bank so he stood in the lobby and did not attempt to cash the check. During the ride back to his office, he offered to loan the money to Wells. He thought Wells was having trouble with his wife and told him to go home. The tape recorded conversations were accurate to the extent they were complete; however, they contained many inaudibles.

At the Peculis' residence on February 28, 1975, Wells gestured by rubbing his fingers together and inquired about the money. This did not appear on the tape recording. He gave the money to Wells. Although Wells suggested an arrangement or association, he only wanted Wells to "sell the Peculises." He later agreed to give Wells a percentage of a

competitive bid on another job. He considered Wells' request for the money on that date to be a shakedown.

OPINION

Defendant contends the trial court erred when it failed to require the State to produce two electronic tape recordings. He initially argues that Supreme Court Rule 411 (Ill. Rev. Stat. 1975, ch. 110A, par. 411) which requires discovery only when the accused is charged with an offense for which, upon conviction, he might be imprisoned in the penitentiary, is unconstitutional.

■■ The State replies that this argument has been waived because it was not presented in the trial court nor specifically mentioned in defendant's post-trial motion. However, the record discloses that defendant's pre-trial motion to suppress specifically raised this argument. The post-trial motion alleged error in the denial of the motion to suppress the tapes. Consequently, because this issue was presented and ruled upon in the trial court, we will review it on appeal. *People v. Nunez* (1974), 24 Ill. App. 3d 163, 320 N.E.2d 462; see *People v. Coburn* (1974), 20 Ill. App. 3d 60, 313 N.E.2d 270.

■■ However, upon review we must reject defendant's contention that Rule 411 is unconstitutional. This issue has been reviewed and rejected by our supreme court in *People v. Schmidt* (1974), 56 Ill. 2d 572, 309 N.E.2d 557. There, the court detailed the background behind the rule and the need for a uniform rule of discovery in misdemeanor cases. The court held that the requirements that the State produce a list of witnesses (Ill. Rev. Stat. 1975, ch. 38, par. 114—9), any confession of the defendant (Ill. Rev. Stat. 1975, ch. 38, par. 114—10), evidence negating defendant's guilt (*Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194), and other reports for impeachment purposes satisfied defendant's constitutional rights. (*People v. Schmidt* (1974), 56 Ill. 2d 572, 575, 309 N.E.2d 557, 558; *People v. Narducy* (1974), 23 Ill. App. 3d 805, 320 N.E.2d 235.) In light of these factors and the reasonableness of the State's classification to achieve a legitimate state interest in the administration of its criminal justice system, we reject defendant's argument that Rule 411 is unconstitutional.

Defendant also argues that the tapes were discoverable under *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. The court in *Brady* held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment. (*Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196; accord, *People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40.) Here, at the time of his

initial request for the tapes, defendant was charged with committing the offense of commercial bribery with the intent to influence Wells to inflate the amount of the fire loss. It is uncontroverted that the tapes contained a specific statement by defendant that Wells would not be required "to jack up the estimate," as well as several other exculpatory statements to the charge and statements inculpatory of another intent. Thus, when requested, the tapes were clearly favorable to defendant and material to his guilt on the crime for which he was charged. (Compare *People v. Murdock* (1968), 39 Ill. 2d 553, 237 N.E.2d 442, *cert. denied* (1971), 404 U.S. 957, 30 L. Ed. 2d 274, 92 S. Ct. 324; and *People v. Sumner* (1969), 43 Ill. 2d 228, 252 N.E.2d 534, with *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562, and *People v. Richards* (1976), 40 Ill. App. 3d 717, 353 N.E.2d 74.) The trial court's orders denying defendant's three pretrial requests for production of the tapes were erroneous.

■■ The State argues that the suppression was proper because the value of the exculpatory statements was *de minimus* when considered in conjunction with preceding and subsequent statements on the tape. The State has cited no authority which would allow it to withhold evidence favorable to defendant because it is in proximity to other inculpatory evidence. Indeed, even if the tapes were only valuable for impeachment purposes, the State has a duty to disclose this material to defendant. *United States v. Esposito* (7th Cir. 1975), 523 F.2d 242; *People v. Cagle* (1969), 41 Ill. 2d 528, 244 N.E.2d 200.

■■ Finally, the State argues the suppression was harmless error because it subsequently amended the complaint by deleting the allegation that defendant intended to have the loss estimate inflated and substituted an allegation of intent to wrongfully influence the homeowners, thus making the taped exculpatory statements irrelevant. We do not believe the State's subsequent amendment cured the erroneous deprivation of defendant's due process rights. An accused has the right to exculpatory material at the time he requests its production. (*People v. Dixon* (1974), 19 Ill. App. 3d 683, 312 N.E.2d 390.) At the time defendant made his three pretrial requests for production he was charged with an intent to inflate and not an intent to influence the homeowners. The tapes exculpated the intent charged. When the State prepared the complaint it had the exculpatory materials in its possession. Nonetheless, it chose to inform defendant that he was charged with acting with the intent to inflate the amount of the loss. Similarly, in its opening statement the State told the jury that defendant offered a bribe with the intent to inflate the loss. Defense counsel then stated the defense to the charge would be that defendant gave Wells a gift after the loss estimate had been accepted by all parties. When the State changed its theory of intent in midtrial by amending the complaint, defendant was forced to either recant its stated

defense or proceed with a defense which had been prepared to respond to a different version of the offense. To allow the State to bootstrap its erroneous suppression by subsequently amending the complaint would offend the constitutional safeguards of a fair trial and substantive due process. Whether having been given the tapes, defendant would have defended on a gift and entrapment theory, would have pleaded guilty in exchange for a negotiated sentence, or would have pursued another strategy, thus depriving the State of the opportunity to amend during the trial is a matter upon which we will not speculate. However, given any number of possible ways a proper disclosure could have affected the outcome of defendant's trial, we are not convinced beyond a reasonable doubt that the error was harmless. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Smith* (1967), 38 Ill. 2d 13, 230 N.E.2d 188.

In view of our opinion that the suppression was reversible error, we need not consider the remaining contentions on appeal.

For the reasons given, the judgment of the circuit court is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

SULLIVAN, P. J., and MEJDA, J., concur.