(No. 42775.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. CORNELL STEEL, Appellant.

*Opinion filed October 2, 1972.*

FINNE, WHITCUP & FIALA, of Chicago (FREDRIC R. FINNE and EDWARD M. FIALA, JR., of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and WILLIAM K. HEDRICK, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County defendant was convicted of murder and upon the jury's recommendation the death penalty was imposed. (Ill.Rev.Stat. 1969, ch. 38, par. 1—7(c)(1).) He appeals directly to this court (Ill.Rev.Stat. 1971, ch. 110A, par. 603) raising specific issues of error hereinafter enumerated and concluding that the proceedings, when taken in their entirety, were conducted in such manner as to deprive him of a fair trial. He therefore seeks reversal of his conviction and remandment of the cause for a new trial.

On the evening of December 25, 1968, Officer George Sperekas arrived at 4160 Drexel Boulevard in Chicago in response to a "sick person call." He was informed by Donald Griffin that there was a body in Apartment 307. The policeman entered and discovered the body of the victim, James McCain, on the bedroom floor. Several .45 caliber "pellets" were recovered at the scene.

Medical testimony indicated that deceased had been shot five times with death resulting from two bullet wounds to the brain. Powder residue found on deceased's jacket indicated that several shots had been fired at close range.

Defendant's cousin, Frankie Ingram, testified that on December 11, 1968, she overheard a conversation between her mother and defendant wherein he stated, "I am going to get McCain." She later observed him in the building where deceased was shot and he had a gun. However, her mother disputed the fact that this witness was present during the only conversation she had with defendant in December, 1968.

William Jones testified that he had met defendant on the morning of the murder. During their conversation defendant displayed a gun and stated he was going to kill McCain.

Jones, Derrick Griffin, Donald Griffin and Eric Gardner were called as occurrence witnesses to the events which transpired in the apartment prior to the arrival of Officer Sperekas. They, as well as several others who were present at the time deceased was shot, were members of a street gang called the Blackstone Rangers. During a discussion McCain was accused of changing his allegiance to a rival gang and attempting to "take over the neighborhood." At this point defendant produced a gun and ordered McCain, who was unarmed, to stand near the wall and then to kneel on the floor. He complied and then began to beg another gang member to intercede in his behalf and the latter told defendant not to shoot. However, defendant fired several shots at McCain who collapsed on the floor. He then fired a final shot which struck deceased in the head. All fled the apartment, but Donald Griffin remained in the building until the police arrived.

The defense produced five alibi witnesses who testified that defendant was attending a party at the time of the murder. However, a review of the record demonstrates that various conflicting statements were elicited on cross-examination which cast substantial doubt upon the credibility of their testimony.

Defendant first assigns error to the trial court's limitation of defense counsel's cross-examination of William Jones. He now contends that his trial counsel was not permitted to inquire into the arrest of this witness (*People v. Barr, 51 Ill.2d 50*) or as to his residence (*Alford v. United States, 282 U.S. 687, 75 L.Ed. 624, 51 S.Ct. 218*) in order to establish motive or bias which may have resulted from promises or fear arising from his detention.

We do not agree. After direct examination, the State, outside the presence of the jury and after defense counsel's inquiry, told the court that this witness was under arrest for possession of marijuana. The trial court then informed defense counsel that he could inquire as to any pending charge and any agreement having been made with the

witness for his testimony but could not inquire concerning his arrest. Thereafter, in the presence of the jury, defense counsel asked whether any promises had been made with regard to a pending charge against him and he said "No."

A witness may be cross-examined concerning those circumstances relating to a pending charge which bear upon his credibility. (*People v. George, 49 Ill.2d 372, 380; People v. Mason, 28 Ill.2d 396, 400-401.*) However, the latitude permitted on cross-examination is within the discretion of the trial court and a reviewing court will not interfere unless this discretion is clearly abused. *People v. Barr, 51 Ill.2d 50, 51; People v. George, 49 Ill.2d 372, 381; People v. Halteman, 10 Ill.2d 74, 86.*

In *Barr*, during cross-examination, defendant was denied the right to inquire if any charges, which may have been related to his alleged criminal acts, were pending against the witness. In the present case it was established that an unrelated charge against William Jones was pending. Moreover, defense counsel never asked what the substance of that charge was and defendant cannot now complain that the nature of the charge (possession of marijuana) was kept from the jury's knowledge. Hence, while the essence of the charge was not given to the jury, they were informed that a charge was currently pending against this witness and he denied any promises had been made in regard thereto.

Nor do we find his contention persuasive that he was not permitted to establish where William Jones was living, for the record refutes this argument. On cross-examination the witness reiterated the fact that he was presently staying in the prosecution's witness quarters. Defense counsel then asked the witness where he lived prior to his present stay. The State's objection to this question was sustained. As stated in *Alford*, "Even if the witness were charged with some other offense by the prosecuting authorities, petitioner was entitled to show by cross-examination that his testimony was affected by fear or

favor growing out of his detention." (282 U.S. at 693.) The court there reversed defendant's conviction after concluding that the trial court had abused its discretion in curtailing cross-examination at the threshold of inquiry. In the present case the jury was presented with evidence of where the witness was presently living and, as heretofore discussed, the fact that no promises relating to a pending charge were made. In this manner we believe that the jury was apprised of relevant information necessary to determine the credibility of this witness and we cannot say that the trial court abused its discretion by imposing the limitations of which defendant now complains.

Similarly, he argues that the cross-examination of Derrick Griffin, an occurrence witness, was unduly restricted. This witness testified that several hours after the shooting he was called and informed by a police officer, later identified as Detective Pendleton, that his brother, Donald Griffin, was at police headquarters and, if he did not appear at the station and tell the police what occurred "something would happen" to his brother. Defense counsel then asked the witness if his brother had been arrested for the murder and released after he, Derrick, had told the police what had taken place in the apartment which was shared by his brother and another gang member. The trial court sustained objections to this series of questions.

The record does not establish that this witness had any knowledge that his brother Donald Griffin had been arrested or charged with the murder. He stated that after the shooting he went to a friend's apartment and then to his own home where he was contacted by the police and asked to appear at the station. During this period his brother had remained in the building and was then taken to police headquarters.

Detective Pendleton testified that he telephoned Derrick Griffin and informed him his brother was under investigation. However, he denied Donald Griffin was ever placed under arrest. He further stated that the brothers

had not communicated with each other prior to relating their separate accounts of the crime which were substantially identical. Under these circumstances, we believe the trial court should have permitted this inquiry, but its exclusion was not prejudicial.

He next maintains that the limitation imposed upon Donald Griffin during cross-examination was improper when an objection was sustained to an inquiry as to whether this witness was accused of the murder. We have held that a defendant "has a right to question a witness concerning any matter which goes to explain, modify, or discredit what he said on direct examination." *(People v. Barr, 51 Ill.2d 50, 51.)* We believe that the trial court should not have sustained this objection. However, prior to this series of questions the witness had stated that no promises or threats had been made to him which influenced his testimony. On redirect examination he acknowledged that the only promise made by the State's Attorney was to aid him to enlist in the military and leave the city. In contrast the jury was presented with overwhelming evidence of defendant's guilt, including the testimony of his cousin who established that he was planning "to get" deceased two weeks prior to the murder. After examination of the record we find this error was harmless beyond a reasonable doubt and the jury would not have reached a different verdict even if the witness would have responded affirmatively to the question. See *Milton v. Wainwright (1972), 407 U.S. 371, 33 L.Ed.2d 1, 92 S.Ct. 2174; People v. Wilson, 51 Ill.2d 302.*

The right of a State's witness, Eric Gardner, to testify is also challenged. His name had not appeared on the original or amended witness lists and defense counsel objected when he was called. The trial court afforded defense counsel an opportunity to speak to him prior to his testifying, which defense counsel did not exercise.

Further, the State explained that not until a week and a half prior to the commencement of trial had they

discovered the whereabouts or true identity of this witness. The trial court was also informed that this witness's testimony was merely corroborative of the other three occurrence witnesses who identified him as being in the apartment. Based upon these factors Eric Gardner was allowed to testify after the trial court admonished the State to confine its examination to events which took place at the scene of the murder.

" 'The purpose of the requirement that a list of witnesses shall be furnished the defendant is to prevent surprise and afford an opportunity to combat false testimony.' [Citations.] We have repeatedly held that 'allowing unlisted witnesses to testify is within the discretion of the trial court and in the absence of a showing of surprise or prejudice that discretion will not be reviewed.' [Citations.] And the 'burden of showing surprise or prejudice is on the defendant.' [Citation.] " (*People v. Raby, 40 Ill.2d 392, 401-402.*) Here defense counsel was afforded an opportunity to interview the witness and he did not specifically request a continuance. Moreover, the record indicates the State offered defense counsel a copy of this witness's prior statement. Under these circumstances we do not believe that defendant was prejudiced. (See *People v. Jordan, 38 Ill.2d 83, 93; People v. Welch, 22 Ill.2d 558, 561.*) The record further reflects that defense counsel was not completely surprised when this witness was first called, because counsel was able to state the fact that the witness had been in custody since the previous week and was preparing to join the military. We find the defendant has failed to sustain his burden.

It is further urged that reversible error was committed when Eric Gardner's mother was precluded from testifying because she violated the trial court's order excluding witnesses. In chambers, defense counsel claimed that she entered the courtroom as her son began to testify but he told her to leave and she complied. However, Officer William Corbett, who was present and assisting the

prosecution, testified that he saw her in the courtroom during the majority of her son's testimony.

Defense counsel argued that Mrs. Gardner would not "say anything pertaining to the actual issues that we are testifying to this morning" and then made an offer of proof asserting that if she were allowed to testify she would state that her son had been arrested the previous week, held incommunicado for several days and her efforts to see her son had proved futile. She would further assert that her son had told her that he would receive 5 to 18 years in prison if he did not testify.

We have said that "it is within the sound discretion of the trial judge to permit a witness to testify who has violated an order excluding witnesses, and that the exercise of this discretion will not be disturbed on review unless it is made to appear that the party offering the witness has been deprived of material testimony without his fault." (*People v. Bridgeforth, 51 Ill.2d 52, 63.*) The testimony of Eric Gardner was merely corroborative of the three other occurrence witnesses who had placed him at the scene of the murder and he had admitted his presence and substantially corroborated their accounts. He further admitted on cross-examination that the previous week he had been arrested for disorderly conduct, released on bond and was presently residing in the witness quarters. His mother's assertions, as described in the offer of proof, would not have established that her son's testimony was untrue. We conclude that her exclusion did not deprive defendant of sufficiently material testimony requiring reversal of his conviction.

He also maintains that the conduct of his privately retained counsel, while not demonstrating total incompetency, deprived him of due process of law. To support this contention he claims: (1) defense counsel failed to prove, as asserted in his opening statement, that defendant was intoxicated at another location at the time of the murder; (2) he failed to insist upon the presence of a court reporter

during *voir dire* thereby precluding him from establishing that the jury was prejudiced by adverse publicity and not selected in compliance with *Witherspoon v. Illinois, 391 U.S. 510, 20 L.Ed.2d 776, 88 S.Ct. 1770;* and (3) he failed to object to the State's inflammatory closing argument.

Defendant's first example of alleged incompetence is without merit. The mere fact that retained counsel stated what he believed that the defense would prove does not indicate incompetency when subsequent testimony does not substantiate his assertion. See *People v. Clark, 7 Ill.2d 163, 168.*

The failure to obtain the presence of a court reporter during *voir dire* in order to establish that the jurors may have been affected by prejudicial publicity is equally without merit. The record demonstrates that the reporter was always available upon request. Defense counsel failed to exhaust his peremptory challenges and this strongly supports the conclusion that the jury was impartial and uninfluenced by any alleged prejudicial publicity. (*People v. Marino, 44 Ill.2d 562, 570; People v. Brinn, 32 Ill.2d 232, 236.*) Moreover, as hereinafter discussed, we conclude that counsel's failure to demand a court reporter to assure that the mandate of *Witherspoon* was fulfilled or to object to certain statements in closing argument do not require reversal of defendant's conviction.

The criteria for determining incompetency of retained counsel are strict. (*People v. Redmond, 50 Ill.2d 313.*) "[W]here representation by counsel of defendant's choice is of such low calibre as to amount to no representation at all, or reduces the court proceedings to a farce or a sham, defendant is denied the fair trial contemplated by the due process guarantees of the Federal and State constitutions." *People v. Somerville, 42 Ill.2d 1, 5.*

The record indicates that defense counsel participated in the jury selection and exercised peremptory challenges. He made an opening statement to the jury. During the presentation of the State's witnesses he interposed objec-

tions to many questions and then, with the exception of deceased's mother, cross-examined each witness in great detail. He presented his alibi witnesses and, finally, a closing argument during which he attempted to discredit certain testimony. After examination of the totality of counsel's conduct, we hold that defendant has failed to establish incompetence.

It is finally urged that, when viewed in light of the security precautions, sequestration of the jury and the inflammatory remarks of the prosecution in closing argument, defendant was deprived of a fair trial.

He argues that the "unusual" method utilized in *voir dire* may have caused the jury to fear for their safety. Prospective jurors were individually examined in chambers in the presence of defendant and counsel. However, defendant has waived any basis for contesting this procedure. After the trial court had outlined the proposed jury selection process, defense counsel stated that he had no objection.

He also asserts that the jurors were aware of publicity pertaining to his case which caused their apprehension. However, there is no contention that this publicity prejudiced the jury and, as we have previously noted, the opposite conclusion is strongly supported. The trial court meticulously instructed the jury at appropriate intervals in the proceedings not to read or discuss any matter relating to the trial. The bailiffs who were assigned to attend the jury were similarly admonished in this regard. The record discloses a conscientious effort by the trial court to safeguard defendant's right to a fair trial.

He further claims that the jury should not have been sequestered after defense counsel objected. At the time of defendant's trial, sequestration of the jury in a capital case was permitted if there existed the "probability that prejudice to the defendant or to the State will result from such separation." (Ill.Rev.Stat. 1969, ch. 38, par. 115—4(m).) The trial court concluded that this might

occur. In view of the nature of the charge, the penalty sought to be imposed and defense counsel's fear of prejudicial publicity, as evidenced by his pretrial discussions with the court, no error was thereby committed.

Defendant also maintains that the presence of guards in the courtroom and the search of spectators could have reasonably influenced the jury to believe that he was a dangerous man. There is no indication that the presence of security personnel influenced the jury, nor was there any objection to the guards' presence during the trial. Prior to the trial's commencement the parties agreed with the court as to certain security procedures. Before the court convened, all spectators were to be removed and those desiring to re-enter the courtroom would be searched in the corridor out of the jury's view. During post-trial motions defense counsel indicated for the first time that the jury viewed these searches. However, the trial court disputed his observation and counsel finally stated that he believed at least one person was visible to the jury as he was being searched. We believe this contention is speculative and does not establish a basis for substantiating defendant's claim that he was denied a fair trial.

He also asserts that segments of the State's closing argument were inflammatory and directed to the jurors' passion. We cannot agree. Having reviewed the entire closing argument, we find it was based upon the evidence and reasonable inferences which may have been established and it did not transcend the bounds of legitimate comment to such extent as to require reversal of his conviction.

Subsequent to our taking this case under advisement, the United States Supreme Court held that the death penalty was violative of the eighth and fourteenth amendments of the Federal Constitution. (*Furman v. Georgia* (1972), 408 U.S. 238, 33 L.Ed.2d 346, 92 S.Ct. 2726.) In a subsequent decision the court applied *Furman* to invalidate a sentence of death imposed under Illinois law, thereby eliminating the necessity of determining whether

there was compliance with *Witherspoon. (Moore v. Illinois (1972), 408 U.S. 786, 33 L.Ed.2d 706, 92 S.Ct. 2562.)* However, in *Moore* the majority sustained defendant's conviction. Having found no reversible error in the present case, we affirm defendant's conviction but vacate his sentence and remand this cause to the circuit court of Cook County, with directions to resentence him to a penalty other than death.

*Affirmed and remanded, with directions.*