THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RONALD JACKSON *et al.*, Defendants-Appellants.

(No. 56515;

First District (1st Division)—November 27, 1974.

James J. Doherty, Public Defender, of Chicago (Stanton Bloom, Assistant Public Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Linda West Conley, Assistant State's Attorneys, of counsel, and Nicholas Iavarone), for the People.

Mr. JUSTICE HALLETT delivered the opinion of the court:

Defendants were convicted of armed robbery (Ill. Rev. Stat. 1969, ch. 38, par. 18—2) and each was sentenced to serve from 3 to 7 years

in the penitentiary. They appeal, contending (1) that each was denied due process of law when the trial court denied their motion to suppress the in-court identification testimony; (2) that the State failed to prove them guilty beyond a reasonable doubt; (3) that defendant Jackson was denied due process of law by the prosecutor's disclosure of the details of Jackson's pretrial plea-bargaining negotiations; (4) that defendant Dunbar was denied due process of law when the trial judge denied his motion to sever his trial from that of defendant Jackson following the disclosure to the jury of Jackson's pretrial plea-bargaining negotiations; (5) that each was denied due process of law when the prosecutor tendered police reports and grand jury minutes to defense counsel in the presence of the jury during cross-examination of the complaining witness; and (6) that each was denied due process of law by the prosecutor's closing argument to the jury. Defendants ask us to reverse outright or to reverse and remand for a new trial. For reasons which follow, we affirm.

On January 23, 1970, the complainant, Frank Zmigrodski, was repairing an automobile parked outside the office of his used car lot located at 1719 North Western Avenue in Chicago, when he was approached by three men. He recognized one of them as one who previously had inquired with respect to the purchase of an automobile. The man suggested that the four men retire to his office and, when they did so, the three men attacked him. Two of them held his arms while the other pummeled his face and one of them produced a knife. They robbed him of approximately $65, a silver wristwatch, and a bottle of whiskey. They then proceeded to rip the telephone wires from the wall and to wrap them around the victim's limbs.

The victim freed himself and started across the street to get to a telephone and summon the police. In the street, he met a passing motorist, Herbert Warden, who inquired as to his hurry. A few short moments before, Warden had seen a trio behaving in a suspicious manner—running down the middle of a nearby street. There was snow on the ground from a recent snowfall, and he had seen the three men walking in the tracks left by passing automobiles. One of them, who was dressed in green pants, apparently unaware of the existence of Warden's car, slipped when he suddenly saw it and stumbled against it. He placed his hand upon the headlight to regain his balance and continued on his way. Another of the three slipped and fell in the snow. He got up and joined the other two, whereupon they resumed their journey down the street. The motorist continued until he noticed the victim. Putting three and one together, he questioned the victim and upon being informed of the circumstances of the robbery and a description of the three, he informed

the victim that he had seen the men and would return to where he had seen them and follow them. He left and the victim then called the police.

The motorist soon located the three men near where he had last seen them. They were still "walking fast, looking back." He recognized the one in green pants who had stumbled against his car. He noted that another of the three wore red pants. The third was wearing dark clothing. He attempted to follow them but they noticed his presence and he returned to the scene of the crime.

The police were there already and he informed them of the above. He then directed them to where he had last observed the trio. En route to the scene, they broadcasted a description of the three over the radio to other patrolling policemen, one of whom noticed three men standing in an alley near the place described. One of the three wore red pants. Another wore green pants. The third wore dark clothing.

The three men were located in a T-shaped alley and they tried to escape, but the one in red pants and the one in green pants were captured and arrested. The man in red pants was the defendant Jackson and the man in green pants was the defendant Dunbar. They were taken to headquarters and searched.

A knife and $2 were found on Jackson. Dunbar was found to have a silver wristwatch, some money, and a bottle of whiskey. They were then placed in a lineup. The victim and Warden were asked by police to view the lineup separately. Each saw four black males. Two were young. One wore red pants. Another wore green pants. The victim identified Jackson and Dunbar as two of the three men who robbed him. Warden also identified Jackson and Dunbar as two of the men he had followed. The victim subsequently identified the wristwatch police had found in Dunbar's possession as the one which had been stolen from him.

Defendant Jackson made a pretrial motion to suppress any in-court identifications of him stemming from the lineup on the ground that the lineup was unnecessarily suggestive. Dunbar did not join in the motion. The motion was denied.

At trial defendant Jackson testified that he had been arrested while on his way with Dunbar to Jackson's brother's house after having unsuccessfully stopped to see Dunbar's girlfriend, who was not at home. He stated that he carried a knife for protection and that his head was bandaged and his arm was in a sling when arrested. Dunbar also testified. He corroborated Jackson's story respecting their whereabouts at the time of the crime. He added that the watch allegedly stolen by him was not the watch taken from him by the constables.

In rebuttal a police officer testified that it was the same watch and

that he remembered no head bandage or sling worn by Jackson at the time of the arrest.

The jury found both men guilty and they were sentenced to 3 to 7 years in the penitentiary.

■■ The first issued raised by the defendants pertains to whether they were denied due process of law when the trial court denied Jackson's motion to suppress identification testimony. We shall consider this issue only with respect to defendant Jackson since defendant Dunbar never made a motion to suppress of his own accord, never joined in Jackson's motion, and never objected at trial to the in-court identification. Therefore, this argument is waived as to Dunbar. *People v. Thomas* (1971), 132 Ill.App.2d 198, 201, 267 N.E.2d 703.

Jackson contends that his motion should have been granted because the lineup unnecessarily suggested to identifying witnesses that he was the culprit. He argues that he (and Dunbar) was the only one exhibited to the witnesses in clothing allegedly worn by the culprit and that he (and Dunbar) was the only one exhibited who was approximately the age of the described culprits. He maintains that as a result, the lineup directly resulted in a mistaken identification. We disagree.

■■ The burden is on the defendant to establish that within the totality of the circumstances the lineup was so unnecessarily suggestive as to give rise to a substantial likelihood of irreparable mistaken identification (*Stovall v. Denno* (1967), 388 U.S. 293, 301-302, 18 L.Ed.2d 1199, 87 S.Ct. 1967; *Neil v. Biggers* (1972), 409 U.S. 188, 196, 34 L.Ed.2d 401, 93 S.Ct. 375; *People v. Weathers*, 23 Ill.App.3d 907, 320 N.E.2d 442.) Should defendant succeed in meeting this burden, then the in-court identification would be held inadmissible. However, substantial differences in age and appearance between suspects and other exhibited in a lineup do not in themselves establish that a lineup was unnecessarily suggestive. Such differences affect only the credibility of the identification; not its admissibility (*People v. Norfleet* (1972), 4 Ill.App.3d 758, 764, 281 N.E.2d 761; *People v. Terczak* (1968), 96 Ill.App.2d 373, 378, 238 N.E.2d 626.) In any case, even if the lineup is found to have been invalid, the identification in court may still be admissible provided that the State establishes by clear and convincing evidence that the identification is based on an observation independent of and prior to the tainted lineup. *People v. Fox* (1971), 48 Ill.2d 239, 245, 269 N.E.2d 720; *People v. Weathers*, 23 Ill.App.3d 907, 320 N.E.2d 442.

■■ In the present case there are two reasons why the identification was admissible. First, the differences between the defendant and others in the lineup were not of the sort which affect admissibility of the identification. They affected only the credibility of the identifying witness' testimony. We have examined the record carefully and have found that

defense counsel quite ably spotlighted the problems with the lineup identification. The jury was properly informed and left to assess the credibility of the defendant's identification and to determine how much weight it was to be given.

Second, the State met its burden of showing an independent origin to the in-court identification. The record shows that both identifying witnesses had ample opportunities to observe the culprits for several minutes under conditions of good lighting. The victim first saw a man he identified as Jackson when that man inquired prior to the robbery with respect to possibly purchasing an automobile. He saw that man again and another, whom he identified as Dunbar, at close range while they robbed, pummeled and tied him. Warden also saw them at very close range when one slipped and fell against his car (Dunbar) and the other slipped in the snow near the car (Jackson). He also followed them for several blocks. Both witnesses provided the police with detailed descriptions of the trio. Where there has been ample opportunity to observe the culprits at close range under good lighting and detailed descriptions of the culprits are given to police, notwithstanding a tainted lineup, there is a sufficient independent origin to the in-court identification to render that identification admissible (see *People v. Cook* (1969), 113 Ill.App.2d 231, 237-238, 252 N.E.2d 29). It follows that the trial court properly denied Jackson's motion.

■■ Defendants next contend that they were not proven guilty beyond a reasonable doubt. While it is true that the identifications in court were not absolutely positive, it is also true that the trial took place some 14 months following the robbery and that at the trial the identifying witnesses testified that they had positively identified the defendants on the day of the robbery. Thus, while the passage of time may have somewhat clouded their memories, nevertheless, they did recall positively identifying the defendants several hours following the crime when their memories were fresh and vivid. Further, the men strongly resembled descriptions given to police of the robbers as to age, race, sex, build, weight, clothing worn, and physical characteristics. They also were arrested not far from the scene of the robbery and not long after it. There was also testimony that a watch stolen by the culprits from the proprietor was found later that day in the possession of Mr. Dunbar. Dunbar also was found with a bottle of whiskey. Jackson was found with a knife (the proprietor was held up with a knife). Given the nature of all the testimony, we conclude that the jury, whose job is to weigh the credibility of witnesses and determine the facts, properly concluded that the defendants were guilty. Indeed, we hardly can conceive how they could have concluded otherwise. Since the findings were not palpably erroneous,

we decline to substitute defendants' suggested conclusion. *People v. Hyman* (1972), 8 Ill.App.3d 382, 385, 290 N.E.2d 627; *People v. Werhollick* (1974), 22 Ill.App.3d 810, 816, 317 N.E.2d 652.

■■■ The third issue raised by this appeal concerns defendant Jackson who maintains that he was denied due process of law when the prosecutor disclosed to the jury details of his pretrial plea-bargaining negotiations. It would, of course, be prejudicial to a defendant for the jury to be informed of his plea-bargain negotiations (Ill. Rev. Stat. 1971, ch. 110A, par. 402(f); see also *People v. Haycraft* (1966), 76 Ill.App.2d 149, 154, 221 N.E.2d 317) since the jury might then conclude that he must be guilty based on the suspicion that an innocent defendant would not bargain with the State's Attorney. However, where, as in this case, defendant himself induces the error by testifying in response to his counsel's questions that he was offered a plea bargain but refused it, we hold that the prosecutor is justified in inquiring further into the negotiations. Otherwise, the jury might be left with the idea that defendant's refusal to plea bargain with the prosecutor was proof of his innocence, which is another non sequitur. Defendant cannot claim error when he himself induces it. *People v. Stock* (1974), 56 Ill.2d 461, 472, 309 N.E.2d 19; *People v. George* (1971), 49 Ill.2d 372, 379, 274 N.E.2d 26; *People v. Weathers*, 23 Ill.App.3d 907, 320 N.E.2d 442.

The fourth issue on appeal concerns the defendant Dunbar. He contends that he was denied due process of law when the trial court denied his motions for mistrial and severance following the introduction of evidence pertaining to Jackson's pretrial plea-bargaining negotiations. Dunbar speculates that what the jury would likely infer concerning Jackson's guilt from the prosecutor's comments, they would similarly infer concerning his guilt. We disagree.

■■ Granting a mistrial and ordering a severance are matters within the sound discretion of the trial court and are usually granted only when the defenses of two or more defendants are shown to be antagonistic (*People v. Yonder* (1969), 44 Ill.2d 376, 386, 256 N.E.2d 321; *People v. Earl* (1966), 34 Ill.2d 11, 13, 213 N.E.2d 556.) We have examined the record and have found no evidence of antagonism. First, and most important, on cross-examination by the prosecutor, Jackson denied initiating or accepting a plea-bargain offer. Thus, there was no prejudice to Dunbar as might have been the case if Jackson had initiated or accepted the offer thereby indicating his guilt (see *People v. Miller* (1968), 40 Ill.2d 154, 158, 238 N.E.2d 407). Second, the jury was carefully instructed to consider the plea-bargain discussion only with respect to Jackson. Since there was no guilt by association conceivably involved here due to the plea-bargain revelation and since there were careful limiting instructions

to the jury, we hold that the trial court did not abuse its discretion in denying Dunbar's motions.

The next issue concerns both defendants. They maintain that they were denied due process of law when the prosecutor tendered police reports and grand jury minutes to defense counsel in the presence of the jury during cross-examination of the proprietor. The reports and minutes contained previous statements by the proprietor concerning the crime. This practice was condemned in *People v. Beard* (1966), 67 Ill.App.2d 83, 214 N.E.2d 557. The court held there that an accused is entitled to any relevant non-privileged statements concerning commission of the crime given by witnesses to police investigators or representatives of the State's Attorney prior to trial. Defense counsel might then be able to use the statements to aid him in preparing the trial and, should the occasion arise, use them to impeach the testimony of those witnesses. However, to tender the statements and reports to defense counsel while defense counsel is cross-examining a witness in front of the jury is unfair to a defendant since the jury might presume that the statements and reports corroborate the witness' testimony if defense counsel does not then utilize them to impeach the witness.

■■ However, there is an exception to this rule. This court stated in *People v. Scott* (1972), 4 Ill.App.3d 279, 285, 280 N.E.2d 715:

"In the instant case, while it was improper for the State's Attorney to have tendered the statements in the presence of the jury we think that defendant was not prejudiced thereby. The record reveals that it was defense counsel who first called the jury's attention to the existence of the documents during his cross-examination of Mrs. Marbury prior to the complained of tender by the State's Attorney. No argument was made to the jury by the State upon the inferences which might be drawn from the failure of the defense to present the statements in evidence * * * [W]e find that the incident did not substantially affect the right of defendant to a fair trial. See *People v. Burks* (1969), 105 Ill. App.2d 112."

This is precisely what occurred in the present case. The reports and statements were tendered at the insistence of defense counsel. Further defense counsel then attempted to utilize them for impeachment purposes. Finally, he also requested that the reports be given to the jury. Under these circumstances, we hold that there was no prejudice to defendants.

The final argument is that the assistant State's Attorney exceeded the boundaries of fair commentary during his closing argument to the jury, thereby depriving defendants of due process of law. The argument was improper but the defendants were not substantially prejudiced by the

remarks in view of the overwhelming evidence of their guilt which, as we previously indicated, was established beyond a reasonable doubt. (*People v. Clark* (1972), 52 Ill.2d 374, 390, 288 N.E.2d 363; *People v. Weathers*, 23 Ill.App.3d 907, 320 N.E.2d 442.) Nevertheless, we think a discussion of the prosecutor's argument is merited in view of our Supreme Court's recent decision in *People v. Butler* (1974), 58 Ill.2d 45, 317 N.E.2d 35.

In one instance, the prosecutor accused Jackson of having "rehearsed" and manufactured his testimony at the instruction of his attorney, thereby inferring that Jackson had lied to the jury when he denied guilt. This was improper since it was merely an expression of the prosecutor's opinion, totally unsupported by any evidence (*People v. Jackson* (1966), 35 Ill.2d 162, 171, 220 N.E.2d 229, citing with approval *People v. Williams* (1962), 26 Ill.2d 190, 193, 186 N.E.2d 353.) It was also improper because it suggested that defense counsel had resorted to trickery and deception to free his client. *People v. Savage* (1934), 358 Ill. 518, 522, 193 N.E. 470; *People v. Freedman* (1954), 4 Ill.2d 414, 422, 123 N.E.2d 317; *People v. Stewart* (1973), 12 Ill.App.3d 226, 231, 297 N.E.2d 391.

During the final argument, he also stated:

> "Jackson now tells you that the place where we were for ten minutes [*sic*] was at Dunbar's girlfriend's house, Francine Franklin, at 2216 North Division. Well, for heaven's sake that is our case, that is right there, Francine Franklin, she is the key to this case. Francine Franklin is the person with whom these two innocent people were because if they spent ten minutes with Francine they couldn't possibly have committed this crime, not by any stretch of the imagination. Wouldn't it be nice to hear from Francine * * * * "

We find this commentary uncalled for. It is improper for the prosecutor to comment on defendant's failure to call witnesses where the comment suggests that the witness would have testified unfavorably to defendant and the witness is as accessible to the State as she would be to the defendant (*People v. Munday* (1917), 280 Ill. 32, 42, 117 N.E. 286). Here, the State could have produced Ms. Franklin at any time if the prosecutor had so desired. He did not. The reason is simple. The defendants had not proffered the defense of alibi. It will be recalled that they testified only to having been at Ms. Franklin's home looking for her. They never saw her or gained admittance to her home because she was not there. She therefore could not confirm nor deny defendant's presence at her home. Thus, her testimony would have been totally irrelevant. Knowing this, the prosecutor nevertheless sought to leave the

jury with the impression that Ms. Franklin, if she had testified, would have testified unfavorably to the defendants. This was improper.

■■ In *People v. Butler* (1974), 58 Ill.2d 45, 317 N.E.2d 35, the supreme court condemned the prosecutor where he had cross-examined a witness solely for the purpose of prejudicing the jury against the defendant because of defendant's somewhat questionable moral habits. The court indicated that defendant's living arrangements with certain women to whom he was not wed had absolutely nothing to do with whether defendant was guilty of the offense charged (murder). The court acknowledged that mistakes will happen in any trial, but it categorically rejected tactics utilized by the defense or prosecution calculated to destroy the credibility of witnesses where such attacks were either irrelevant to the issues at trial or wholly unsupported by any known evidence. The court concluded,

> "* * * While we are reluctant to reverse judgments where such improprieties seem not to have affected the verdicts, our prior criticisms seem to have had little effect so long as the judgments are not reversed. Consequently, we have concluded that disciplinary action against offending counsel may be the only effective deterrent. So that counsel may be forewarned, we here announce our intention, in reviewing future trials, to refer to the Disciplinary Commission for appropriate action those members of the bar responsible for conduct of the type herein referred to." (58 Ill.2d 45, 52.)

This court took the same view with respect to closing arguments of counsel in *People v. Weathers*, 23 Ill.App.3d 907, 320 N.E.2d 442.

We therefore affirm the judgments in all respects.

Judgment affirmed.

EGAN, P. J., and BURKE, J., concur.