THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ANDRE L. AGEE, Defendant-Appellant.

First District (2nd Division)   No. 79-360

Opinion filed May 20, 1980.

76

Frederick F. Cohn, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and Paula M. Daleo, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE PERLIN delivered the opinion of the court:

Defendant, Andre L. Agee, was charged by information with the offense of armed robbery (Ill. Rev. Stat. 1973, ch. 38, par. 18—2). After a jury trial, defendant was convicted and sentenced to serve a term of four to seven years in the State penitentiary. Defendant appeals his conviction. We consider the following issues: (1) whether the trial court erred in limiting defense counsel's impeachment of the victim, when the proper foundation was not laid for that testimony; (2) whether the trial court erred in restricting defense counsel's cross-examination of a witness; (3) whether defendant was denied a fair trial when the jury was not instructed on the definition of "dangerous weapon" and (4) whether the prosecutor's comments during closing arguments exceeded the bounds of fair comment and thus deprived defendant of a fair trial.

For the reasons hereinafter set forth, we affirm defendant's conviction.

On June 23, 1977, Stanley Chesney (hereinafter referred to as the victim) was robbed by three youths in the elevator of the building located at 1165 North Milwaukee Avenue in Chicago, Illinois. On the following day Andre L. Agee (hereinafter referred to as defendant) was arrested and identified in a police lineup as one of the perpetrators of that crime. The following evidence was adduced at his trial:

The victim testified that on June 23, 1977, he was employed as a delivery man by Congress Pizza, and in accordance with that employment he was required to make a delivery of several pizzas to the building at 1165 North Milwaukee in Chicago, Illinois. In order to gain entry to the building, he called apartment 2411 (his first delivery) and was electronically admitted by use of the security "buzzer" system. Two boys, later identified as defendant and Renaldo Jackson rode the elevator with the victim, where they departed on the 15th floor. The victim continued to the 24th floor, made his delivery, returned to the elevator and proceeded to the sixth floor for his second delivery. While descending, the elevator stopped on the 15th floor where defendant, Jackson and a third youth (later identified as "Huron") entered the elevator. The victim was facing the other passengers during the ride down; as the elevator approached the sixth floor he turned toward the door to prepare to leave. At that point Jackson "tripped" the elevator so that it stopped between the seventh and sixth floors, and the door opened; the victim asked what was "going on" and defendant answered, "We don't want your pizza. We want your money." Defendant pushed the victim against the corner of the elevator, reached in his own belt and pulled out a hard, cold object which he placed at the victim's neck and announced that he had a gun. Although the victim did not actually see the weapon, he testified regarding his familiarity with firearms and stated that the object looked like a revolver. Defendant reached into the victim's back pocket and took a wallet containing two $20 bills. Jackson searched the victim's left pocket and found some keys which he did not take. Huron searched the victim's other pocket and took approximately $10 to $15 in change. The three offenders then fled the elevator and ran down the hall on the lower floor. The victim rode the elevator to the first floor and told the security guard, Lieutenant Howard, that he had been robbed by the boys who had gotten on the elevator with him. A woman standing in the lobby at that time stated that she had seen three boys on the 15th floor. Howard and the victim went to apartment 1502 and explained to the woman who answered the door that three boys had been seen running to her apartment. The men were denied admittance so they went to apartment 1501 where they were permitted to call the police. Upon the officers' arrival, the victim gave a description of the three offenders to the police and returned to the pizza parlor.

78

The following day the victim returned to the building to inquire whether his wallet had been returned. Lieutenant Howard said it had not been found but that he thought he recognized one of the offenders. He gave victim a piece of paper with the nickname "Scoop" on it and verbally suggested a general address in the 1000 block of Milwaukee as a possible lead. Victim took this information to the police and two officers were sent to investigate the matter. The victim later identified defendant at a lineup as the assailant with the gun. He also identified defendant from a photograph of the lineup and made an in-court identification.

Lieutenant Howard, the security guard on duty at 1165 North Milwaukee on June 23, 1977, testified that on the date in question he saw the victim enter the building and noticed two boys, one of whom was defendant, talk to victim in the lobby and then ride the elevator upstairs. Approximately 15 minutes later victim returned and told Howard that he had been robbed. A woman standing in the lobby at that time overheard their conversation and said that she had seen three boys get off the elevator on the 15th floor and enter apartment 1502. Howard and the victim went upstairs to see the occupant of that apartment but were refused admission. Howard then went to apartment 1501 and telephoned the police. At that time Howard knew defendant only by the nickname of "Scoop." When he saw victim on the following day, he gave him that name and an approximate address on a slip of paper.

Christopher Baggett lived with his mother, Christine Franklyn, at 1165 North Milwaukee Avenue in apartment 606. Baggett testified that on June 23, 1977, his mother asked him to go downstairs to check for a pizza delivery. When he reached the first floor, he discovered that the pizza had not arrived, so he went upstairs to see a friend who lived in apartment 711. This friend was not home, so he went to the elevator to return to his apartment on the sixth floor. As he entered the elevator he saw the pizza delivery man and three boys, one of whom was defendant. While the elevator was still on the seventh floor, defendant stopped the elevator. A second boy put one of his hands in his own pocket and robbed the pizza delivery man. The third boy went through the victim's pockets while defendant opened the door and told Baggett to leave the elevator. Baggett did as he was directed and ran down the hall to the stairway.

Defendant testified that on the date in question he and Jackson went to the building at 1165 North Milwaukee at approximately 7 p.m. to visit a friend, identified only as Huron, who lived in apartment 1502 in that building. When they arrived at the elevator, a pizza delivery man and two women got on and rode the elevator upstairs with them. They proceeded to Huron's apartment and spent a few minutes there before the three of them returned to the elevator. When it stopped on their floor, Christopher Baggett and the delivery man were already on the elevator. During the

descent, Huron pulled a gun or "something" and announced a robbery. He then told Jackson to "jam" the elevator between floors seven and six, which he did. Defendant testified that Huron told the pizza man that "I want your money, not your pizza." Defendant, Jackson and Baggett, whom defendant had previously told to leave the elevator, got off and ran down the stairs. Defendant was arrested the following day.

Defendant further testified that he was not sure whether the object Huron held was a gun, but he was certain that it was placed at the back of the victim's neck. Defendant claimed that although Baggett testified that defendant "jammed" the elevator, it was, in fact, Jackson who had done so. Defendant stated that he was mistaken in his earlier testimony when he stated that Baggett was on the elevator when it arrived at the 15th floor. Baggett actually got on at the eighth or seventh floor. Defendant stated that he did not report the robbery to the security guard because they were not on good terms, nor did he report the robbery to the police because "when you do you just get a name in the neighborhood" and "if you tell on them they will get you."

Julio Garcia, a Chicago police officer, testified on behalf of the State that on June 23, 1977, he was working with police officer Casas when they received a call to investigate a robbery at 1165 North Milwaukee. His partner took the initial report, and a written record was made as a result of the complaint. Garcia did not talk to the complainant and did not write the police report.

Kenneth Sullivan, a Chicago police officer, testified on the State's behalf that he was one of the officers who arrested defendant on June 24, 1977. He had been given a slip of paper by victim which contained the name "Scoop," and he also received a general description of the suspect from the victim. He proceeded to the general neighborhood of the address given by victim and began to question various youths concerning the whereabouts of "Scoop." After determining that someone with that nickname lived at 1027 North Milwaukee, he went to that address and asked for "Scoop." When defendant came to the door, Sullivan determined that he matched the general description in the original police report, whereupon defendant was arrested and given *Miranda* warnings.

The defense attempted to call Officer Casas, the Chicago police officer who was Officer Sullivan's partner on the night in question and who completed the police report in response to the robbery investigation. Defense counsel indicated that the testimony of Officer Casas would be elicited in an attempt to impeach the victim's testimony concerning the descriptions given to the officer on the night of the robbery and contained in the police report. Counsel maintained that these descriptions differed from the descriptions given by the victim at trial and therefore were prior inconsistent statements. The State objected to any testimony which

80

Officer Casas might give on the ground that the proper foundation for this testimony had not been laid by defense counsel when the victim was testifying. The court sustained this objection and refused to allow defense counsel to recall the victim to lay the proper foundation. In ruling on the objection, the court noted (1) that Officer Casas would testify that the descriptions contained in the police report were given to him by the victim and (2) that these descriptions indicated that, contrary to the victim's testimony at trial, someone other than defendant was holding the gun.

Defendant was found guilty of armed robbery and sentenced to serve four to seven years in the State penitentiary. Defendant filed a motion for a new trial, which was denied, and he now appeals.

Defendant initially contends that the trial court erred in excluding alleged impeachment testimony merely because the foundational requirement for introduction of that evidence was lacking. Defendant maintains that the court's adherence to strict evidentiary rules effectively denied him (1) the right to confront the victim with a prior inconsistent statement or (2) if the ruling was correct, then the court erred in denying him the right to cure any defect resulting therefrom by recalling the victim for further cross-examination. The State asserts that defendant's rights were not abridged by the court's ruling because defense counsel had previously cross-examined the victim and failed to lay a proper foundation for the impeaching testimony of police officer Casas. Further, the State argues that the court's refusal to allow the defense to recall the victim for purposes of laying the foundation for impeachment was not error.

Defendant contends that the description given to the police by the victim on the night of the robbery, and contained in the police report, described the gun-carrying assailant as being five feet eight inches tall, weighing 135 pounds and wearing a red/black shirt and black pants. The victim testified that defendant was the man with the gun but also stated that defendant was wearing dark pants, a white "t-shirt," a yellow button-type sweater (unbuttoned) and no hat. The defense asserts that the description in the police report of the man with the weapon does not match the description of the defendant which was given by the victim at trial; it is more consistent with the victim's testimony concerning the third offender identified only as "Huron." Clearly, the two descriptions differ with respect to which offender was carrying the gun.[1]

During the victim's cross-examination, defense counsel elicited detailed descriptions of the three assailants and established that the victim

---

[1] The police report was not admitted into evidence since the defense was not allowed to pursue the impeachment. However, the police officer testified at defendant's preliminary hearing as to the descriptions contained in the report. At trial, the victim described Huron as being five feet seven inches tall, wearing dark cut-off shorts and a bluish red shirt.

had given this information to the police when he reported the robbery. However, counsel failed to ask whether the victim had ever given a different description of the offenders or to inquire whether, in fact, the descriptions contained in the police report were those given by him. In an effort to impeach this portion of the victim's testimony, defense counsel requested that the reporting officer be allowed to testify regarding the description in the police report. The court sustained the State's objection to the witness because defense counsel failed to lay the proper foundation necessary to elicit any impeaching testimony from the witness.

It is well settled that a defendant has a right to confront the witnesses against him, and it is not disputed that the credibility of a witness may be impeached by prior inconsistent statements. (*People v. Morgan* (1963), 28 Ill. 2d 55, 190 N.E.2d 755.) However, certain foundation requirements must necessarily be pursued prior to the introduction of the impeaching material. *People v. Sanders* (1974), 56 Ill. 2d 241, 306 N.E.2d 865, *cert. denied* (1974), 417 U.S. 972, 41 L. Ed. 2d 1143, 94 S. Ct. 3178.

In claiming error in the trial court's ruling, defendant directs our attention to the evidentiary rules of the Federal court and urges this court to follow the new developments of the law in this area.

■■■ The Federal rules of evidence do not accurately reflect the present state of the law in Illinois. The requirement for introduction of impeaching evidence was enunciated in *People v. Ellis* (1976), 41 Ill. App. 3d 377, 385, 354 N.E.2d 369, where the court stated:

> "A proper foundation consists in the satisfaction of two distinct requirements: the witness must be asked as to time, place, and persons involved in the alleged conversation; secondly, the witness must be asked whether he made a certain contrary statement at that time."

In the present case defense counsel failed to fulfill this second requirement. He inquired whether victim had given descriptions of the assailants to the police but in no way indicated during cross-examination that the police report may contain a discrepancy; nor did he offer the witness an opportunity to explain or deny the apparent inconsistency. The cases relied upon by defendant for the proposition that his constitutional right to confrontation was violated (*People v. Sumner* (1969), 43 Ill. 2d 228, 252 N.E.2d 534; *People v. Cagle* (1969), 41 Ill. 2d 528, 244 N.E.2d 200) are inapplicable in this situation. Those cases involved a refusal to allow impeachment testimony due to the prosecution's failure (*Sumner*) or the trial court's misunderstanding (*Cagle*). The error in this case was attributable to the defense. Further, limitation of cross-examination is a matter resting solely within the discretion of the trial court, and absent a clear abuse of that discretion, it will not be disturbed on review. *People v. Steel* (1972), 52 Ill. 2d 442, 288 N.E.2d 355.

Defendant asserts that if the court's refusal to allow the testimony of the reporting officer was proper, then he should have been permitted to recall the victim in order to lay the proper foundation. Although as a general rule a party will not be allowed to impeach his own witness (*People v. Kelly* (1976), 39 Ill. App. 3d 190, 350 N.E.2d 163), the court does have the power to permit the recall of such witness for the purpose of laying a proper foundation for subsequent impeachment. (*People v. Ladas* (1957), 12 Ill. 2d 290, 146 N.E.2d 57.) In *Ladas* the trial court permitted the State to recall the defendant in rebuttal and lay the foundation for a subsequent impeachment. The Illinois Supreme Court held that this decision was a "matter resting in the sound discretion of the court * * *." (*Ladas*, at 294.) However, in *People v. Sanders* (1972), 5 Ill. App. 3d 89, 282 N.E.2d 742, *aff'd* (1974), 56 Ill. 2d 241, 306 N.E.2d 865 (1974), *cert. denied* (1974), 417 U.S. 972, 41 L. Ed. 2d 1143, 94 S. Ct. 3178, the court refused to permit the defense to recall a witness after completion of cross-examination. In noting that the defense was in no way prejudiced by this refusal, the court stated that without a "clear abuse, a reviewing court should not disturb the trial court's exercise of discretion with respect to the recalling of a witness." (*Sanders*, at 95.) Therefore it appears that although the trial court has the authority to recall a witness under the circumstances presented here, it is under no duty to do so, and absent a clear abuse of discretion, the trial court's ruling should not be disturbed.

Defendant in the case at bar failed to fully pursue the cross-examination of the victim. In this case the information was available to the defendant, and the prosecution was in no way responsible for the failure of defendant to elicit the desired testimony, and it cannot be said that the trial court abused its discretion in refusing defendant's request.

Alternatively, defendant argues that if the court's ruling on the foundational requirement was correct, the defendant was denied a fair trial due to the incompetence of his attorney. The State maintains that any error on the part of defense counsel at trial was harmless and in no event rises to the level of incompetence that would warrant a reversal in this case.

Defendant's right to effective assistance of counsel is guaranteed by both the United States Constitution (*Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792) and the Illinois Constitution (Ill. Const. 1970, art. I, §8). Counsel in this case was privately retained; therefore the test of incompetence is whether the representation given defendant was "of such a low caliber as to amount to no representation at all or reduces the court proceedings to a farce or a sham." (*People v. Torres* (1973), 54 Ill. 2d 384, 391, 297 N.E.2d 142.) The competency of defendant's representation by counsel must be judged by the totality of

the circumstances in the particular case. *People v. Morris* (1954), 3 Ill. 2d 437, 121 N.E.2d 810; *People v. Carter* (1976), 41 Ill. App. 3d 425, 354 N.E.2d 482.

■■ Defendant argues that failures on the part of the trial attorney which are not due to trial strategy but which are attributable to lack of knowledge on the part of counsel are not waived on appeal. "[W]aiver by counsel as a matter of trial strategy is binding on an accused, while waiver of rights not constituting trial strategy will not bind an accused unless he participates in the waiver." (*People v. Nichols* (1975), 27 Ill. App. 3d 372, 383, 327 N.E.2d 186, *aff'd* (1976), 63 Ill. 2d 443, 349 N.E.2d 40.) Although defense counsel's failure in the case at bar to properly impeach the victim was apparently not due to trial strategy, counsel's overall performance adequately represented defendant's rights at trial. Among other things, he secured the release of defendant on a bond motion, he conducted a hearing on the motion to suppress the identification of defendant, and he offered impeachment of the victim by demonstrating the victim's inability to remember various details concerning the night of the robbery. He also made lengthy opening and closing statements to the jury. We do not find that, based on the totality of the circumstances, counsel's representation of defendant amounted to "no representation at all" or "reduced the proceedings to a farce or a sham." *People v. Steel* (1972), 52 Ill. 2d 442, 288 N.E.2d 355.

Defendant next asserts that the trial court erred in limiting his cross-examination of Lieutenant Howard. Howard testified on direct examination that he had a conversation with an unidentified woman in the lobby immediately after the victim reported the robbery. This woman allegedly indicated that she had seen three boys get off the elevator on the 15th floor and enter apartment 1502. On cross-examination, defense counsel tried to elicit the entire conversation between Howard and this woman in an attempt to discern the time she saw the three boys. This examination was limited when the prosecutor objected to the questioning on grounds of hearsay and relevancy.

Defendant maintains that the conversation was improperly offered by the State and that once this area of inquiry was opened, the defense should not have been limited in pursuing its cross-examination of the witness concerning the remainder of the conversation. The State maintains that defendant has failed to preserve this issue on appeal and additionally asserts that the evidence was properly admitted for a limited purpose and that defendant suffered no prejudice by the court's limitation of its cross-examination of Howard.

■■ It is well settled that failure to maintain a timely and proper objection to inadmissible evidence constitutes a waiver of that issue on appeal. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817; *People v. Ross*

84

(1968), 41 Ill. 2d 445, 244 N.E.2d 608, *cert. denied* (1969), 395 U.S. 920, 23 L. Ed. 2d 237, 89 S. Ct. 1771.) Further, there is no doubt that failure to raise an issue in a post-trial motion results in waiver. (*People v. Irwin* (1965), 32 Ill. 2d 441, 207 N.E.2d 76.) In the instant case, counsel failed to object to the State's direct examination of Lieutenant Howard, and it does not appear as an issue in defendant's post-trial motion. Consequently this issue has not been preserved for purposes of appeal and is not now properly before this court.

■■■ Assuming *arguendo* that this issue has not been waived, it does not appear that defendant's contentions are well founded. Defendant incorrectly characterizes Howard's testimony as hearsay; however, it was admitted merely to preliminarily inform the jury concerning the investigatory procedure taken by the guard and was therefore properly admitted for this limited purpose. (*People v. Daliege* (1976), 40 Ill. App. 3d 706, 352 N.E.2d 247.) Additionally this testimony was not objected to by the defense, and no limiting instruction was requested. It follows that defendant's reliance on *People v. Kalpak* (1957), 10 Ill. 2d 411, 423-24, 140 N.E.2d 726, where the Illinois Supreme Court held that the State's earlier introduction of incompetent evidence precluded them from complaining when the defense "availed themselves of similar evidence within the field of inquiry" is inappropriate, since the testimony in the instant case was not "incompetent" but was properly admitted.

Further, the defense was actually able to elicit the entire conversation between Howard and the woman. After the objection to the original inquiry had been sustained, the following testimony was obtained from Howard during cross-examination:

"Q. Was there any additional conversation between * * * you and this individual [the woman] prior to proceeding to the 15th floor?

A. The additional information was that the three boys got off on the 15th floor and proceeded to 1502.

Q. That was all she said?

A. Yes."

Howard's answer, in the affirmative, to this questioning reveals that no other information passed between the parties during that conversation. It is evident then that the entire conversation between the two consisted of the information previously disclosed. Thus defendant was in fact able to present to the jury the totality of the conversation with this woman even though the court had, by its earlier ruling, limited defense counsel's inquiry. This same rationale applies to defendant's reliance on *People v. Tunstall* (1959), 17 Ill. 2d 160, 161 N.E.2d 300, and *People v. Paradise* (1964), 30 Ill. 2d 381, 196 N.E.2d 689. In both of these cases the court required that the jury be given limiting instructions concerning the limited

purpose for which otherwise inadmissible evidence was being introduced. Since defendant received the full benefit of having the entire conversation (as opposed to the detriment of the conversations disclosed in *Tunstall* and *Paradise*), presented to the jury, the failure of the trial court to give limiting instructions did not prejudice the defendant.

Defendant next contends that he was denied a fair trial because the jury was not instructed concerning an essential element of the offense charged. The jury was instructed on the definition of robbery and armed robbery, but they were not given a specific instruction defining "dangerous weapon." The State maintains that this issue was not properly preserved for review and additionally that an instruction defining "dangerous weapon" was unnecessary on the facts of this case.

■■ It is not disputed that defendant failed to tender an instruction on the definition of "dangerous weapon." The general rule is that a party requesting a particular instruction must tender it to the court. (*People v. Moorelander* (1962), 25 Ill. 2d 309, 185 N.E.2d 166; Ill. Rev. Stat. 1977, ch. 110, par. 67; Ill. Rev. Stat. 1977, ch. 110A, par. 451.) This rule has been modified in criminal cases where the defendant's right to a fair trial would be substantially impaired absent an instruction. (*People v. Parks* (1976), 65 Ill. 2d 132, 357 N.E.2d 487; *People v. Davis* (1966), 74 Ill. App. 2d 450, 221 N.E.2d 63.) It appears that defendant has waived this issue, and for the reasons set forth below we do not feel that this modification to the general waiver rule is applicable to the facts in this case.

It has been held that a gun is presumptively a "dangerous weapon" (*People v. Dwyer* (1927), 324 Ill. 363, 155 N.E. 316), but not every gun "is a dangerous weapon as a matter of law." (*People v. Greer* (1977), 53 Ill. App. 3d 675, 681, 368 N.E.2d 996.) This distinction indicates that an object that has the outward appearance of a gun is presumed to be loaded and operative and consequently dangerous. Generally, an objective test has been used to determine whether an accused possessed a dangerous weapon at the time of the commission of the crime. (*Greer.*) However, it has recently been held that a subjective test should be used to determine whether a dangerous weapon has been used in an armed robbery. (*People v. Chapman* (1979), 73 Ill. App. 3d 546, 392 N.E.2d 391.) The object in the offender's hand in the instant case was made of a hard metal and could have been used as a bludgeon. Therefore, under the objective test it may have been a "dangerous weapon" whether or not it was, in fact, a gun. (*People v. Ratliff* (1974), 22 Ill. App. 3d 106, 317 N.E.2d 63; *Greer.*) Further, it was certainly used to threaten the victim into submitting to the demands of the offender, and thus under the subjective approach (*Chapman*) the jury may also have found the weapon to be "dangerous." Under either approach the jury had sufficient information to form an opinion concerning the character of the object.

Where the character of the instrument was in issue, it was for the jury to determine whether it was dangerous. (*Dwyer.*) Although the removal of an essential element of a charged offense from consideration by the jury is error (*People v. Richards* (1975), 28 Ill. App. 3d 505, 328 N.E.2d 692), if the "terms in question are of general use, and are not technical terms or words of art, they need not be defined, in the absence of anything in the charge to obscure their meaning." (*People v. Monroe* (1975), 32 Ill. App. 3d 482, 488, 335 N.E.2d 783.) In the present case the jury was instructed on the elements of robbery and armed robbery, and there is no indication that there was anything in the charges to obscure the meaning of the term "dangerous weapon." Their guilty verdict on the armed robbery charge is a sufficient indication that they impliedly found the object used in perpetrating the crime to be a "dangerous weapon." *Richardson.*

Further, it appears that viewing the trial as a whole, the jury was not deprived of the "essential guidance" required to insure that defendant received a fair trial. (*People v. Parks* (1976), 65 Ill. 2d 132, 357 N.E.2d 487.) The victim testified that he was familiar with firearms and that it appeared that the object protruding from the offender's hand was a gun. He stated that it was a cold, metal object and that it was placed to his neck. Defendant testified that although he did not participate in the robbery, he saw the perpetrator put an object to the victim's neck and demand money even though he was not sure that it was, in fact, a gun. Under these circumstances the actual character of the instrument was in doubt, but the threatening nature and use of the object with its proximity to the victim's person was ample evidence to convince the jury that a "dangerous weapon" had been used in perpetrating the crime.

Defendant finally maintains that he was denied a fair trial due to the prosecutor's prejudicial remarks during closing argument. The State maintains that this issue has not been properly preserved for review and alternatively that the prosecutor's remarks were not so inflammatory as to require reversal.

The comments complained of were made during the prosecutor's closing argument and were not objected to by the defense although they were raised in defendant's post-trial motion. Failure to make a timely objection to improper remarks generally constitutes a waiver of that issue for purposes of appeal. (*People v. Skorusa* (1973), 55 Ill. 2d 577, 304 N.E.2d 630.) Notwithstanding the general rule, a reviewing court may consider the argument if the defendant would be so prejudiced as to be deprived of a fair trial. (*People v. Brown* (1974), 20 Ill. App. 3d 1064, 313 N.E.2d 488; *People v. Vasquez* (1972), 8 Ill. App. 3d 679, 291 N.E.2d 5.) It should be noted that in determining the fairness of defendant's trial, the trial court is generally given wide latitude in controlling the comments

made during argument. (*People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.) In addition, where the allegedly improper comments are initially brought to the attention of the trial court in the form of a post trial motion, that court is "in a far better position * * * to determine the prejudicial effect * * * of remarks made during argument" and that ruling should not be disturbed absent a clear abuse of discretion. (*People v. Brown* (1974), 20 Ill. App. 3d 1064, 1066.) From the facts in the instant case it appears that this issue has not been properly preserved for determination by this court since no timely objection to the prosecutor's comments was made. Additionally, the trial court denied defendant's motion for a new trial on this issue, and there is no evidence that the trial court abused its discretion in so ruling.

■■ However, even if there was no waiver, it does not appear that the comments were so prejudicial as to deny defendant a fair trial. In order to completely understand defendant's contention, it is necessary to set forth the pertinent portion of the prosecutor's closing remarks. The State made the following argument concerning the testimony of the 10-year-old witness, Christopher Baggett:

> "I think there is a real tragedy in the testimony of Christopher Baggett because it's one thing to go to a kid's house or on the street, maybe someone, the defendant, put a little pressure on him. 'Well, you're going to say that I didn't have anything to do with it aren't you?' * * * it's quite another thing——and this is the tragedy of it—to bring a kid, ten years old, into a court of law, have him take an oath, and come in and tell a story like that * * *."

Defendant maintains that these comments amounted to an accusation of suborning perjury on the part of defendant when no evidence of that conduct was presented at the trial and that the prosecutor's comments were therefore improper. The general rule is that it is improper for a prosecutor to make inflammatory statements to the jury on matters not in evidence. (*People v. Jackson* (1974), 24 Ill. App. 3d 700, 321 N.E.2d 420.) Although the prosecutor's comments in the case at bar may have been ill-advised, it cannot be said that they were so prejudicial as to deny the defendant a fair trial. (*People v. Nemke* (1970), 46 Ill. 2d 49, 263 N.E.2d 97; *People v. Coleman* (1977), 51 Ill. App. 3d 499, 366 N.E.2d 1026.) Mere improper statements in argument will not warrant a reversal unless it is "reasonably clear that they influenced the jury in a manner that resulted in substantial prejudice to the defendant." (*Coleman*, at 515.) The cases relied upon by defendant evince prosecutorial conduct that far surpasses any irregularity present in the case at bar. In *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402, the prosecutor made repeated, deliberate and blatantly improper remarks to the jury, and in *People v. Stock* (1974), 56 Ill. 2d 461, 471, 309 N.E.2d 19, the court stated that the prosecutor's

"repeated disregard of the bounds of proper argument was so flagrant and purposeful" that it prejudiced the rights of the defendant to a fair trial. It does not appear that the prosecutor's remarks in the instant case were so prejudicial as to deny defendant a right to a fair trial.

■■ Defendant further asserts that the prosecutor improperly intimated to the jury that defendant had been involved in continual criminal activity. This remark was in response to defense counsel's closing argument explaining defendant's failure to report the robbery to the police. Defendant cannot claim error if he induces a comment which would otherwise be improper. (*People v. Jackson* (1974), 24 Ill. App. 3d 700, 321 N.E.2d 420; *People v. Coleman.*) In addition, the prosecutor is generally given wide latitude in commenting about the nature of the crime and the character of the defendant. (*People v. Brown* (1959), 16 Ill. 2d 482, 158 N.E.2d 579.) The prosecutor is also privileged to draw any unfavorable inferences from the evidence and use them in denouncing the accused. *People v. White* (1977), 48 Ill. App. 3d 907, 363 N.E.2d 408; *People v. Williams* (1962), 26 Ill. 2d 190, 186 N.E.2d 353.

Further, in viewing the prosecutor's arguments and the trial as a whole (*People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634), it does not appear that the remarks were so highly inflammatory as to substantially prejudice defendant and impair his right to a fair trial. *People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881; *People v. Nemke* (1970), 46 Ill. 2d 49, 263 N.E.2d 97.

For the foregoing reasons we affirm the judgment of the circuit court of Cook County.

Affirmed.

DOWNING and HARTMAN, JJ., concur.