THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* NATHANIEL WARD, JR., *et al.*, Defendants-Appellants.

First District (5th Division)    No. 77-1762

Opinion filed June 29, 1979.

1002

James J. Doherty, Public Defender, of Chicago (Zaven Peter Tokatlian and Frances Sowa, Assistant Public Defenders, of counsel), for appellant Nathaniel Ward, Jr.

Ralph Ruebner and Andrew Berman, both of State Appellate Defender's Office, of Chicago, for appellant Roy Curry.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Mary Ellen Dienes, and Alan David Lyons, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendants were each charged by indictment with four counts of armed robbery. (Ill. Rev. Stat. 1973, ch. 38, par. 18—2.) Following a bench trial, defendants were found guilty on all counts and each sentenced to a term of 5 to 15 years.

Defendants raise two issues on appeal: (1) whether probable cause existed for their warrantless arrests; and (2) whether they were proved guilty beyond a reasonable doubt. We affirm. The pertinent facts follow.

At about 3:30 a.m. on February 23, 1975, Brenda, Jasper and Ruby McElroy, Solomon Jones, and Raymond Mayfield were robbed at gunpoint in a parking lot at 95th Street and Bishop Avenue in Chicago. Defendants were arrested on March 10, 1975, and charged with the crime. Prior to trial Curry made a motion to quash his arrest and suppress any resulting identifications. At the hearing on the motion to quash the arrest, the following pertinent evidence was adduced.

Donald Foulkes, a Chicago police officer, testified. He and his partner, Officer Hayes, were assigned to investigate a robbery that occurred on February 23, 1975. He arrested Curry on March 10, 1975, outside a courtroom at 6100 South Racine. He did not have an arrest warrant nor did he observe Curry committing a crime at that time. He had been assigned to the case on February 24, 1975, and interviewed several of the victims. They described the two assailants. The person carrying the gun was a Negro male, medium brown complexion, approximately 19 to 20 years old, and weighed about 160 pounds. He wore a hat and a black and white tweed coat, and had a scar near his left eye. The second person was a Negro male, light brown complexion, approximately 20 years old, and weighed about 170 pounds. He had light brown hair and wore a brown knee-length leather coat. His original report did not indicate the second man's eye color, but two of the victims, Brenda McElroy and Solomon Jones, had indicated that his eyes were blue. He was also told that a green leather coat had been taken in the robbery.

In the course of investigation Foulkes learned that two people fitting the descriptions of the offenders had been arrested at a Jewel food store and were to appear in court on March 10, 1976. On that date Officer Foulkes observed the two defendants in court. He noted that Curry had sandy brown hair, blue eyes and was about 5'9" or 10" tall. He stated that in his experience it was unusual for a Negro to have sandy hair and blue

eyes. The other defendant fit the general physical description given by the victims, had a scar near his left eye, and wore a green leather jacket.

At the time of his arrest, Curry told Officer Foulkes that he was 26 years old, 5'8" tall and weighed 150 pounds. In his report Officer Foulkes mistakenly wrote that Curry had brown eyes. In his opinion Curry fit the description given by the victims. Defendant's motion to quash was denied. At a subsequent hearing to reconsider the motion, Solomon Jones denied telling any investigating officers that either of the men who had robbed him had blue eyes. The court again denied Curry's motion to quash the arrest.

Curry also made a motion *in limine* to suppress identification. At the hearing on that motion, the following testimony was adduced.

Defendant Curry testified. He participated in two lineups on March 10, 1975. He stated that at one of the lineups he was the only person asked to step out of the lineup a second time and to state his name and occupation. While he was standing there he heard someone say, "Take a good look at him."

Officer Foulkes testified that he conducted two lineups in which Curry was present. Solomon Jones, one of the victims, identified both defendants at the first lineup. The other four victims viewed the second lineup separately. Jasper McElroy made no identification, Brenda McElroy identified both defendants, Ruby McElroy identified Curry, and Raymond Mayfield identified Ward. Officer Foulkes testified that he never told anyone whom to pick from the lineup and that he did not recall any of the witnesses requesting that anyone step from the lineup to be viewed a second time. The court denied Curry's motion to suppress the identification.

The following pertinent testimony was adduced at trial.

Brenda McElroy testified that at about 3:30 a.m. on February 23, 1975, she and the other victims left a lounge where they had attended a birthday party. They went to the Church's Chicken parking lot and found that Solomon Jones' car would not start. Efforts to start the car were fruitless and Jones decided to ride with the McElroys. Her father then discovered that his car had a flat tire. After the tire was fixed, the group prepared to leave. As her father started to get in the car, Ward, whom she identified at trial, walked up and asked him for a cigarette. When Mr. McElroy responded that he had none, Ward announced a stickup. She stated that he carried a "long gun" and wore a wide dark hat and a tweed coat. Ward removed Mr. McElroy's glasses and searched his wallet and pockets. At the same time Curry, whom Brenda also identified at trial, was robbing Mr. Jones and then told Ward to take Ruby McElroy's rabbit coat. Ward also took Mayfield's jacket and Brenda's purse and camera. At the time of the robbery the car was parked next to a light pole facing the

chicken store. Her father was told to "drive straight off" and as he did he struck the pole.

On March 10, 1975, she viewed a lineup at a police station and identified both defendants. She noticed that Ward was wearing Mayfield's jacket, which she had purchased in 1974 for his birthday. She also testified that inside the purse that was taken was her mother's Montgomery Ward charge card.

On cross-examination Brenda stated that she bought the green coat from National Clothing Store on June 22, 1974, and charged it to her mother's account. She also stated that she told investigating officers that one of the robbers had light-colored eyes but did not give a particular color. At the time of the robbery Mr. Jones was returning to the McElroy's car after locking his own and was held up at the rear of their car. She estimated that the robbery lasted 15 minutes. After the robbery her father was allowed into the chicken store by the cleanup crew and called the police.

On redirect examination the witness identified a photograph of the lineup she had viewed, and stated that she identified defendants at the lineup. The picture accurately represented the lineup except that Ward was not wearing the green jacket.

Ruby McElroy's testimony basically corroborated her daughter's account. She stated that after the flat was discovered, Mr. McElroy moved the car to a light in the parking lot to fix the flat. She identified Curry at trial as the man who kept his hand in his pocket and said that the other man held a gun. Her rabbit coat was taken in the robbery. At the lineup she could identify only Curry.

On cross-examination she testified that her attention was directed towards the gun and not at the man holding the gun. She also stated that when she looked at the other man, Curry, she saw him because he stood in the light. At the lineup she recognized Curry by his looks and because he wore the same leather jacket that he did at the robbery.

Jasper McElroy testified. He corroborated the testimony of the previous two witnesses. He identified Ward as the man who held the gun to his head and Curry as the other man. He had seen both defendants at a lineup on March 10, 1975. On cross-examination the witness stated that he could not positively identify anyone at the lineup.

Solomon Jones testified. He basically corroborated the other witness' testimony. He identified Ward and Curry as the men who robbed him. He also identified both men at the lineup. On cross-examination he stated that he did not note the color of Curry's eyes and did not tell anyone that they were blue. He remembered that Ward had a scar near his left eye.

Raymond Mayfield testified. He basically corroborated the other witnesses' testimony. He identified Ward as the man who held the gun on

Mr. McElroy. He had previously identified Ward at a lineup. He identified the green leather jacket as the one that Brenda McElroy had given him for his birthday and which was taken in the robbery. He recognized the jacket by a cologne stain on one arm and a scratch in the leather. He had seen the same jacket on Ward during the lineup.

On cross-examination Mayfield stated that during the robbery Ward was directly in front of him. He could not see the other man at all. He could not identify Curry as the second man.

Kenneth Kelly, a sales clerk for Montgomery Ward, testified. On February 25, 1975, he was working in the Evergreen Plaza store. At about 2 p.m. a young black man attempted to purchase a coat and another item with a charge card. When he checked the card's number he learned that it was stolen. He called security and in 3 or 4 minutes Kevin Fitzgerald, a security guard, arrived. The customer was still present at this time. Kelly handed Fitzgerald the charge card and sales slip. At trial Kelly identified a copy of the sales receipt he made out on that day which the customer had signed.

On cross-examination Kelly was unable to identify Curry as the customer with the charge card. He stated that he did not become suspicious when a man had signed "Ruby L. Mc" instead of "Ruby L. McElroy." On redirect Kelly stated that he did not become suspicious of the customer because he thought the man could be the child of the cardholder.

Kevin Fitzgerald, a security guard at Montgomery Ward's Evergreen Plaza Store, testified. On February 25, 1975, at about 2 p.m. he received a call from an operator informing him that there was a lost or stolen charge card in the men's department. He went to that department and saw the sales clerk, Kelly, some merchandise, and a customer, whom he identified as Nathaniel Ward. He was given the sales receipt and charge card, and he asked Ward if it was his card. Ward said that it belonged to his mother who was in the parking lot. He and Ward walked to the parking lot and then back to the mall, where Ward tried to walk away from him. He stopped Ward and brought him to the security office. Fitzgerald said that the green leather jacket looked like the one Ward was wearing when he was stopped.

*For the Defense*

Chicago police officer Ernest Smith testified. He interviewed Mr. Jones and Mr. McElroy after the robbery. One of them had told him that the weapon used was a .22-caliber rifle. He was told that a three-quarter length mink coat and a three-quarter length leather coat had been taken, but no mention was made of a camera or a purse. In his opinion Mr. Jones had been drinking. Officer Smith stated that the descriptions given to him

indicated that the assailants were approximately the same age but that the man with the gun was about 3 inches shorter and 10 pounds lighter than the second man. The gunman wore a burgundy hat and a black and white tweed coat. The reports indicated that the other man had light brown hair and wore a brown knee-length leather coat. He was not told that the second man had blue eyes. He stated that if he had been told this he would have remembered since it would be unusual for a black man to have blue eyes.

On cross-examination he stated that he was told that the gunman had brown eyes and a scar near his left eye.

Chicago police officer Scott testified. He had a very vague recollection of the night in question. He did state that no one told him one of the offenders had blue eyes.

Officer Foulkes testified. He was assigned to investigate the robbery. Ruby McElroy described the gunman as being about 5′8″ tall, weighing 160 pounds, and wearing a black and white tweed coat. The other man was described as being about 5′11″ tall, weighing 170 pounds, and wearing a brown leather jacket. Solomon Jones and Jasper McElroy described the weapon as a .22-caliber rifle. Officer Foulkes admitted that he mistakenly reported that a mink coat had been taken and that it was actually a rabbit coat. He conducted two lineups in which the men wore the clothes they had on when they were arrested, including the green jacket which Ward had on. At the time of the lineup Ward matched the description given by the victims. Ward told him that he was 5′8″ tall, weighed 155 pounds, and was 18 years old. Curry told him he was also 5′8″ tall, weighed 150 pounds, and was 26 years old. A photograph of the six men who appeared in the lineup was taken shortly after the actual lineup. Ward did not appear with the jacket on since Foulkes had inventoried it. He noticed that some things had been torn out of the jacket. He also stated that Mayfield had identified the jacket as the one stolen from him.

Officer Foulkes stated that when he arrested Curry his blue eyes were the most distinguishing feature. He recalled that either Brenda McElroy or Mr. Jones had told him that Curry had light blue eyes.

At this point Ward's motion to quash the arrest and suppress identification was heard. Officer Foulkes was recalled to testify. His testimony was similar and consistent with his earlier testimony at Curry's suppression hearing. He received the information which led to defendants' arrest from several people in addition to the victims. One was an anonymous informer and another was the Jewel security guard. Foulkes met the informer through another investigation. The informer told him that "Matador" and Nate Ward were selling certain items, including coats, on 95th Street. The items matched certain things which

were taken in the robbery. He learned that defendants were to appear in court from the Jewel security guard. When he went to the courtroom at 61st and Racine Streets, Foulkes was looking for a man 5′11″ tall and 170 pounds, and arrested Curry who told him he was 5′8″ and 155 pounds. He also noted that Curry had blue eyes. Concerning Ward, Foulkes was looking for a man about 5′8″ tall, 160 pounds in weight, with a scar near his left eye and wearing a green jacket. When he was arrested, Ward was wearing a green leather jacket and told him that he was 5′8″ tall and weighed 155 pounds. He saw a scar near Ward's left eye. Foulkes knew that a similar jacket had been taken in the robbery. He made the arrest on the basis of the physical description and not the fact that Ward was wearing a green jacket.

Seymour Rose, the credit manager at National Clothing Company, testified. The store ledgers indicated three sales were charged to Ruby McElroy's account in May 1974 but none in June of that year. None of these was for a man's leather jacket; however, one was for a woman's leather jacket. The witness also stated that by looking at the green jacket, he was unable to determine if it was a man's or woman's jacket.

Following argument on Ward's motion, the trial court found that Officer Foulkes had probable cause to arrest defendant and denied the motion.

## *For Defendant Curry*

Mercedes White, Curry's fiance, testified. She stated that on December 24, 1974, Curry was shot in the arm and side. He recuperated at his mother's house until February of 1975 and spent most of his time in bed. He had a cast removed from his right arm on February 18, 1975. On February 23, 1975, she, Mrs. Curry and the defendant watched television at his house from 5 p.m. to 1:30 a.m. When she left he was in bed relaxing and when she returned the next day he was still in bed. On cross-examination she stated that she was not with him at 5:25 a.m. on February 23. She further testified that she felt he was too weak to leave his house during that spring. She had never seen Ward in Curry's presence before their arrest.

Carrie Curry, defendant's mother, testified. Her son had been shot on December 14, 1974, and received treatment for his arm and lung. He did not leave the house on the morning of February 23, 1975, and he still had the cast on at that time. The cast was removed on February 28. She knew that her son was home between 3 and 5 a.m. on February 23, 1975, because she was with him. She had never seen Ward before her son's arrest.

Reverend Wallace Brown testified. He stated that Curry's reputation

in the community was good and that he had helped him to rehabilitate ex-offenders.

Roy Curry, the defendant, testified. In the early morning hours of February 23, 1975, he was at his mother's house recovering from gunshot wounds. The cast on his arm was removed on February 18, 1975, but his physical condition was still poor. He was unable to get about until March. He first saw Ward in a Jewel food store where the two were arrested for disorderly conduct. When he appeared in court on that charge, Officer Foulkes arrested him. Curry claimed that Foulkes told people to point him out at the lineup. He also stated that he was the only person in the lineup with a brown leather coat.

On cross-examination Curry admitted that he had previously been convicted of attempt armed robbery.

### For Defendant Ward

Natalie Ward, defendant's sister, testified. On February 22-23, 1975, she, defendant and several friends played cards from 10 p.m. until about 2 a.m. They watched a late show and then played cards until about 7 a.m. She was with defendant all night. She testified that she had never met Curry. She identified the green jacket as defendant's and stated that he had received it from his cousin prior to February 1975.

Terrance Nash, Natalie's boyfriend, testified. On February 22-23, 1975, he was playing cards and watching television with the defendant from 10 p.m. until about 7 a.m. He had never seen Ward with Curry before their arrest. He also identified the green jacket as belonging to Ward and stated that Ward had it for two or three months prior to the night in question.

Fannie Acklin testified. She identified the green jacket as belonging to Ward. She indicated that it previously belonged to her brother, Dirk Acklin, and that he gave it to Ward in the fall of 1974. She identified the jacket by its two false pockets.

Lula Ward, defendant's mother, testified. Her testimony was consistent with her daughter's regarding the events of February 22-23, 1975. She stated that she did not know Curry. She also identified the green jacket as her son's which he had since October 1974. She also said that he did not own a burgundy hat with a wide brim or a white and black tweed jacket.

Dirk Acklin, Fannie's brother, was brought from jail to testify. He identified the green jacket as his own by a cologne stain and some tears on the jacket. He stated that he received the jacket from his sister and that he last owned it in March 1975. He said that he had given the jacket to Ward at a Halloween party.

On cross-examination he testified that he began wearing the jacket in January 1975. He left the jacket at Ward's house after a party in March 1975. He later stated that he left the coat at Ward's house after a Halloween party in October 1975. He admitted that he had been convicted of rape, robbery and armed robbery.

Nathaniel Ward, the defendant, testified. On February 22, 1975, he began playing cards with his sister and some friends in his basement at about 10 p.m. They later watched television until 5:15 a.m., when the card game was resumed. He went to bed at about 7 a.m. and stayed there until 11:30 or 11:45 a.m. That evening he went to a Jewel food store, where he met Curry for the first time. He attempted to help Curry retrieve his money from a cigarette machine by hitting it. He was stopped by a security guard and arrested.

Regarding the green jacket, he stated that Fannie Acklin had given it to him in October 1974. He and Dirk Acklin shared the jacket from January to March 1975. He was wearing the jacket on March 10, 1975, when he was arrested by Officer Foulkes. He participated in two lineups and heard Foulkes tell the victims to identify him after they could not do so initially. In the second lineup, he was told to wear the green jacket and was then identified.

He further testified that he was at Montgomery Ward's store on February 25, 1975, with a man named Kevin who wanted to buy a coat. He did not try to buy anything at the store nor did he use Mrs. McElroy's credit card. When the security guard inquired about the credit card, he said that it belonged to Kevin and they both went to look for him. The security guard grew impatient and held Ward. He later saw Kevin in custody also. Ward admitted that he was on probation at the time of his arrest for the armed robbery.

On cross-examination defendant tried on the green coat, and it was agreed that it fit him. It was noted for the record that defendant had a scar above his left eye.

After closing arguments, the trial court found both defendants guilty of four counts of armed robbery and sentenced each defendant to terms of 5 to 15 years. Defendants now appeal their convictions.

OPINION

Defendants first contend that their warrantless arrest was made without probable cause and that all resulting identifications should have been suppressed. They argue that at the time of their arrest, Officer Foulkes had only a general description of the suspects. Relying on this court's decision in the case of *In re Woods* (1974), 20 Ill. App. 3d 641; 314 N.E.2d 606, they maintain that this was insufficient to justify their arrest. We disagree.

▪▪ A police officer may arrest a person without a warrant when he "has reasonable grounds to believe that the person is committing or has committed an offense." (Ill. Rev. Stat. 1975, ch. 38, par. 107—2(c).) For purposes of arrest, reasonable grounds and probable cause are synonymous. (*People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537.) The following standard to determine the existence of probable cause was set out in *People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356:

> "* * * 'Whether or not probable cause for an arrest exists in a particular case depends upon the totality of the facts and circumstances known to the officers when the arrest was made. [Citations.] In deciding the question of probable cause in a particular case the courts deal with probabilities and are not disposed to be unduly technical. These probabilities are the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. *Draper v. United States,* 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329; *People v. Fiorito,* 19 Ill. 2d 246.' Also it is proper to recognize in judging whether there was probable cause that '[p]olice officers often must act upon a quick appraisal of the data before them, and the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals.' *People v. Watkins,* 19 Ill. 2d 11, 19." 62 Ill. 2d 273, 276-77.

▪▪ Based upon the facts and circumstances known to Officer Foulkes at the time of the arrest, we find that probable cause existed. The description given by the victims was fairly detailed and included rather unique physical characteristics of the defendants which would allow their accurate identification. Curry had been described as a Negro male, light complexion, 20 years old, light brown hair, light-colored eyes, 5′11″ tall, weighing about 170 pounds, and wearing a brown leather jacket. Before arresting him, Foulkes observed that Curry was approximately 5′9″ or 5′10″ tall, had sandy hair, blue eyes and wore a brown leather jacket. He specifically noted that it was unusual for a Negro to have blue eyes and this was the most distinguishing feature. When arrested, Curry told Foulkes that he was 26 years old, 5′8″ tall, and weighed 150 pounds. Ward had been described as a Negro male, about 19 or 20 years old, weighing about 160 pounds, about 5′8″ tall, with a scar near his left eye. Prior to arresting Ward, Foulkes observed that Ward fit the general physical description, had a scar near his left eye, and was wearing a green coat similar to the one reported stolen. After his arrest, Ward told him that he was 5′8″ tall, weighed 155 pounds, and was 18 years old. There was a substantial similarity between the general description of the suspects and what Foulkes observed. Although a general description alone is insufficient to constitute probable cause (*In re Woods* (1974), 20 Ill. App. 3d

641, 314 N.E.2d 606), Ward's scar and Curry's blue eyes would be sufficiently distinguishing features to cause a reasonable man to believe that these were the two men who committed the armed robbery. The fact that two men fitting the descriptions of the two robbers were together would additionally support a belief that both were involved in the robbery.

Curry contends that the description given to Officer Foulkes did not include blue eyes. Officer Foulkes testified that Brenda McElroy and Solomon Jones had told him that the second man had blue eyes. At trial, Solomon Jones stated that he did not tell anyone that Curry's eyes were blue. Brenda testified that she told investigating officers that one of the men had light-colored eyes but did not give a particular color. In addition, Foulkes' original report did not include the second man's eye color. It appears that at the least, Foulkes knew the second man had light-colored eyes, which may be unusual enough in a Negro to identify him, regardless of his exact eye color. In any event it is the function of the trial court to resolve conflicts in the testimony and to determine the credibility of the witnesses. (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.) The trial court concluded that Foulkes had probable cause to arrest defendants. Based on the totality of the circumstances, we do not find this determination to be manifestly erroneous and will therefore not disturb it. (*People v. Clay.*) Since the defendants' arrests were legal, the trial court properly denied defendants' motions to suppress the lineup identifications.

Defendants argue that the "informant's tip" cannot validate the arrest. As we view the record, the independent corroboration by Officer Foulkes of the various features of the physical descriptions justified the arrest. The tip was not corroborated or acted upon by Officer Foulkes and was not relied on to support the arrest. The same can be said of the information provided by the Jewel security guard. It provided Foulkes the opportunity to observe defendants and to corroborate the information given by the victims, but was not the basis of his decision to arrest defendants. We therefore find defendants' contention on this point to be without merit.

Defendants' second contention is that they were not proved guilty beyond a reasonable doubt. They argue that the victims did not have a sufficient opportunity to view the robbers, were too confused to correctly identify anyone, and subsequently identified defendants at a suggestive lineup.

The first premise of this argument is that the lighting conditions were inadequate to observe the assailants and that when the victims were told "not to look" they looked away. They rely on a statement by Solomon Jones that it was too dark to tell if the gun was a rifle or a shotgun to

establish the lack of sufficient light for identification. Contrary to this position, the testimony of other witnesses shows that the lighting conditions were adequate to allow a positive identification and that ample opportunity existed to do so. Brenda and Mrs. McElroy testified that the car was parked next to a light pole. Both Mr. and Mrs. McElroy stated that the car was moved nearer to the light in order to fix the flat, suggesting that the lighting was better there. Additional light was provided by the chicken store and by the dome light in the car. Brenda McElroy estimated that the robbery lasted 15 minutes. The lighting conditions and the length of time involved would provide ample opportunity to identify the robbers. The fact that Mr. Jones could not clearly see the weapon does not alter this conclusion. In addition, not all the victims looked away when so ordered. Mrs. McElroy testified that she saw Curry when he was in the light, Mr. Mayfield stated that Ward was directly in front of him during the robbery, and Mr. Jones said that Ward looked "dead at" him enabling him to see Ward's "whole face." This refutes defendants' contention that the victims did not sufficiently observe them.

■■ Defendants also maintain that the confusion exhibited by the victims casts doubt on their ability to correctly identify the assailants. They point to the following inconsistencies as demonstrating this confusion: (1) Officer Smith indicated that Mrs. McElroy was not present at the scene; (2) Officer Smith reported a mink coat had been taken from Brenda McElroy instead of a rabbit coat from Mrs. McElroy; (3) Officer Smith reported a three-quarter length jacket was taken from Mayfield while Mayfield identified a waist-length jacket at trial; (4) Officer Smith's report fails to mention that a camera or a purse was taken in the robbery; (5) there was dispute as to whether Brenda was wearing a coat on the night in question; and (6) there was a question about the time that Jasper McElroy, Jr., who had left the group shortly before the robbery, returned. These inconsistencies are minor and can be attributed to errors or misdescriptions made in the initial report. They merely affect the weight and credibility of the testimony and do not overcome the positive and credible identifications of the defendants by the victims. When considered as a whole, the evidence is not so palpably contrary to the verdict as to raise a reasonable doubt of defendants' guilt. *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.

■■■ Defendants also contend that in addition to the victims' lack of opportunity to observe them and the confusion at the scene, the nature of the lineup increased the chances that the identifications were the result of suggestions and not based on observations made at the scene of the crime. They base this contention on the fact that during the lineup Ward wore the green jacket taken in the robbery and Curry wore a brown leather

jacket similar to the one worn by the robber. While this procedure may be unduly suggestive under certain circumstances (*People v. Franklin* (1974), 22 Ill. App. 3d 775, 317 N.E.2d 611), we do not feel that this result occurred in the instant case. The victims were able to provide the police with an accurate and detailed description of their robbers. Their identifications were based on the observations made at the scene and not merely because of the coats defendants wore at the lineup. Even assuming that the lineups were suggestive, a review of the evidence indicates an adequate independent basis for the in-court identifications. The victims had an adequate opportunity to observe defendants for a period of 15 minutes and noticed several peculiar characteristics. This would be sufficient to render the in-court identification admissible. (*People v. Jackson* (1974), 24 Ill. App. 3d 700, 321 N.E.2d 420; *People v. Alexander* (1978), 65 Ill. App. 3d 559, 382 N.E.2d 519.) The allegedly suggestive aspects of the lineup were sufficiently developed at trial to alert the trial court to possible problems. The trial court was thus able to assess the credibility of the victims' identifications and determine the weight to be given to them. (*People v. Jackson.*) This question was resolved against the defendants and we will not disturb that finding.

Finally, defendants contend that a reasonable doubt of their guilt is raised by their alibi witnesses and Curry's convalescence after his shooting. However, there is no obligation on a trial court to believe alibi testimony over positive identifications of an accused even though the alibi testimony is given by a greater number of witnesses. (*People v. Catlett* (1971), 48 Ill. 2d 56, 268 N.E.2d 378.) It is obvious that the trial court did not find the alibi witnesses credible.

■■ In short, the principles to be applied to a trial court's determination were set out in *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513, as follows:

> "A reviewing court may not substitute its judgment for that of the trier of fact 'on questions involving the weight of the evidence or the credibility of the witnesses [citations], and we will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt.' (*People v. Stringer* (1972), 52 Ill. 2d 564, 568.) Finally, 'where the identification of the accused is at issue, the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and he viewed the accused under such circumstances as would permit a positive identification to be made.' 52 Ill. 2d 564, 569." 67 Ill. 2d 564, 578.

Applying these principles to the instant case, we find that the victims positively identified defendants, were credible, and viewed the robbers

under circumstances that permitted a positive identification. Since the evidence is not so improbable as to raise a reasonable doubt of defendants' guilt, their convictions will not be reversed.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.